**DR. FRANKLIN PERKINS SCHOOL, Plaintiff-Appellant, and Cross-Appellee,**

v.

**Dr. Arthur J. FREEMAN, Defendant-Appellee, and Cross-Appellant.**

**Arthur J. FREEMAN and Rhea J. Freeman, Plaintiffs-Appellants, and Cross-Appellees,**

v.

**DR. FRANKLIN PERKINS SCHOOL, Defendant-Appellee, and Cross-Appellant.**

Nos. 82–2490, 83–1465, 83–1538 and 83–1645.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1984.

Decided Aug. 14, 1984.

Rehearing in No. 83–1465 Denied Sept. 17, 1984.

George J. Casson, Jr., Bell, Boyd & Lloyd, Chicago, Ill., for plaintiff-appellant and cross-appellee.

Leland W. Hutchinson, Jr., Freeborn & Peters, Chicago, Ill., for defendant-appellee and cross-appellant.

Before CUMMINGS, Chief Judge, and WOOD and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

On May 18, 1981, Dr. and Mrs. Arthur J. Freeman[1] commenced this diversity action[2] in the Northern District of Illinois against the Dr. Franklin Perkins School ("School"). The complaint was later amended to allege (1) breach of contract for failure to apply for financial support from the State of Illinois, (2) intentional infliction of emotional distress, and (3) fraud and misrepresentation with respect to the School's statement that it would apply for and obtain funding from the State of Illinois to cover the costs of the Freemans' daughter's education for the 1980–81 academic year.

On June 12, 1981, the School commenced a separate diversity action against Dr. Freeman in the District of Massachusetts, alleging the breach of an express and implied contract to pay the School for services rendered in the care and education of his daughter, April Freeman, from 1979 through 1981. In the alternative, the School alleged the right to recover the reasonable value of those services on a *quantum meruit* theory. On February 10, 1982, the action commenced by the School was transferred to the District Court for the Northern District of Illinois. The two actions were then consolidated for discovery purposes and subsequently tried together before a jury.[3]

The trial was bifurcated; the issues of liability were tried separately from the issues of damages. In the liability phase of the trial, the jury found the School liable to Dr. Freeman for breach of contract and fraud, and further found the School liable to Mrs. Freeman for intentional infliction of emotional distress. However, the jury relieved the School of any liability to Dr. Freeman for intentional infliction of emotional distress. As to the School's claims, the jury found no liability on Dr. Freeman's part for either breach of contract or *quantum meruit*.

In the damage phase of the trial the jury granted $4,000 in compensatory damages to Dr. Freeman on his contract claim, $4,000 in compensatory damages and $30,000 in punitive damages to Dr. Freeman on his fraud claim, and $50,000 in compensatory damages to Mrs. Freeman on her emotional distress claim. The School then filed a supplemental motion for judgment notwithstanding the verdict, or in the alternative, for a new trial with regard to the jury's damage awards.[4] The district court granted the School's motion to set aside the jury's liability determinations with respect to Dr. Freeman's fraud claim and Mrs. Freeman's emotional distress claim. The court also set aside the jury's punitive damage award. It denied, however, the School's motion with respect to Dr. Freeman's breach of contract claim.[5]

On March 14, 1983, the district court taxed costs of $5,436.78 against the Freemans because they had failed to recover the requisite jurisdictional amount ($10,000) for a diversity action, 28 U.S.C. § 1332. In addition, the court held that Dr. Freeman had waived costs in the action commenced

---

1. On May 6, 1982, Dr. Freeman obtained leave to add Mrs. Freeman as a plaintiff.

2. Dr. Freeman is a resident of Illinois and the Perkins School is a not-for-profit Massachusetts corporation.

3. On July 7, 1982, prior to trial, the Freemans sought leave to file a second amended complaint adding a claim for damages under the Massachusetts Consumer Deceptive Practices Act. The district court denied their motion for leave to amend the Complaint on July 9, 1982.

4. The School had previously filed a motion for judgment notwithstanding the verdict or in the alternative a new trial with regard to the jury's liability determinations.

5. On August 12, 1982, Dr. Freeman filed a motion to amend the judgment to include a claim for relief under the Massachusetts Consumer Deceptive Practices Act. His motion was denied on January 28, 1983 and judgment was entered on February 8, 1983.

by the School as he had failed to file a bill of costs within ten days of judgment as required by local rule 45(a) of the Northern District of Illinois. Both parties appeal. We affirm in part and reverse in part.

### I.

Dr. Franklin Perkins School is a private, residential school for mentally handicapped children and adults located in Lancaster, Massachusetts. Dr. and Mrs. Freeman are residents of Evanston, Illinois. Their daughter, April, who suffers from Downs' Syndrome,[6] was enrolled at the Perkins School from March 25, 1972 until June 20, 1981. April Freeman was a legal resident of Evanston, Illinois while she was enrolled at the School. The State of Illinois requires local school districts to provide care and education for children, such as April, who are handicapped. Ill.Ann.Stat. ch. 122, § 14–7.01 (Smith-Hurd 1983–1984 Supp.). If the local school district determines that it is unable to provide proper educational opportunities for such children, then it is required to pay for qualified private care, even if it requires the placement of the child in an out-of-state facility such as the Perkins School. *Id.*

The State of Illinois has a specific procedure for purchasing education and care for handicapped children enrolled in out-of-state private schools when public school programs are inadequate. The State's "purchased care" program is administered by two Illinois agencies. The first is a unit of the Illinois State Board of Education ("ISBE") called "Nonpublic School Approval." This agency determines whether a particular school's educational program is eligible. The second agency is the Illinois Review Board whose task is to review all cost information submitted by those providers who were previously determined to be academically eligible and in turn to establish the amount of reimbursement the State will provide to local school districts. The rate set by the Illinois Review Board ("Illi-

nois Rate") represents the maximum amount an Illinois school district may pay a private school for services provided to students.[7] Based on the rate designated by the Illinois Review Board, the local school district will enter into a contract with the eligible school.

The State of Massachusetts also has a procedure for determining the maximum tuition rate to be charged for the care and education of handicapped children. Each school is required to provide detailed cost information to the Massachusetts Rate Setting Commission which in turn sets the school's maximum tuition rate. The rate set by the Commission is equivalent to the amount of public assistance provided to Massachusetts' residents attending that school in any given year. A school may request a rate increase from the Commission through an administrative adjustment procedure, which if granted can have a retroactive effect.

In 1973, the Freemans began to receive tuition assistance from Illinois to pay for the private care April Freeman received at the Perkins School. As a result of Massachusetts and Illinois using different criteria in analyzing the cost data in setting their respective tuition rates for the education of handicapped children, the amounts the Freemans received in assistance from the State of Illinois proved to be insufficient to cover the costs of April's attendance at the Perkins School and, thus, Dr. Freeman was forced to make periodic payments to cover the difference.

In the latter part of the 1970's the Perkins School's tuition rate increased dramatically as a result of its attempting to comply with the more stringent educational, health and safety standards imposed by the State of Massachusetts on those schools educating and caring for handicapped children. In order to achieve compliance with these standards, the Dr. Franklin Perkins School was required to make extensive and

---

6. A chromosomal abnormality which causes, among other things, moderate to severe mental retardation.

7. Joint Statement of Pretrial Compliance ("JSPC") at 4.

costly changes and improvements in its program which were not fully implemented until 1980. As a result, the School's reimbursable cost rose from $7,200 to $19,802 per student during the period from July 1, 1978 to June 30, 1981.[8]

During the period when the School was engaged in upgrading the program it began to experience financial difficulties. Part of the problem was the fact that many out-of-state students at the Perkins School were not paying the full Massachusetts Commission tuition rate. In an effort to alleviate this problem with respect to Illinois' reimbursements, on May 7, 1979, the then executive director of the Perkins School, Franklin Perkins, Jr., wrote a letter to the Illinois Review Board requesting a tuition rate increase for those Illinois residents attending the School in the 1979–1980 school year. He advised the Board that the Massachusetts rate had been increased to $9,969 and also that the School anticipated a further increase in the School's rate to approximately $11,000 for the full 12-month program.[9] On August 22, 1979, the Illinois Review Board informed the School of the 1979–1980 Illinois rate [10] and in addition notified the School that any appeal of the 1979–1980 Illinois rate must be made within 60 days. The 1979–1980 Illinois rate would have been almost sufficient to cover April's tuition for the 1979–1980 academic year at the School, if the School's costs had not continued to escalate.

In mid-October of 1979, however, the Perkins School submitted an application to the Massachusetts Rate-Setting Commission for another increase in tuition. In December of 1979 or January of 1980, the

School's consultant, Paul McLaughlin, contacted the Illinois Review Board to determine what procedure to follow to obtain a similar adjustment of the Illinois rate. He was told that after the Massachusetts Commission had acted on the School's application for the tuition increase, he should submit the same application and supporting materials to the Illinois authorities. On January 28, 1980, the Massachusetts Commission approved a new tuition rate of $17,636 per year, which retroactively took effect on August 31, 1979. Shortly thereafter, the School appealed to the Illinois Reimbursed Care Review Board for an identical increase in its Illinois tuition rate. On April 4, 1980, the Illinois Review Board denied the School's request for a higher Illinois rate because the School had failed to file its appeal within 60 days of the Board's original decision on August 22, 1979, even though the Board had the authority to waive the time period requirement for cause.

During this same period the School corresponded with Dr. Freeman about the forthcoming tuition increases. According to his own testimony, Dr. Freeman received a letter from Dr. Perkins, Jr., in February 1979 advising him of the upgrading of the School's program and that a tuition increase from $7,200 to $10,500 per year was likely. On June 18, 1980 the School informed Dr. Freeman that the Massachusetts Commission had approved a tuition rate of $9,969 effective May 17, 1979 and further that the School expected an additional increase to $11,000 for the 12 month program sometime after July 1, 1979.[11]

---

**8.** *See* Appellant's Brief at 11 for 1979–1981 tuition rate increases:

| Date Rate Set | Effective Dates | Rate |
|---|---|---|
| May 11, 1978 | July 1, 1978—May 16, 1979 | $ 7,200 |
| May 23, 1979 | May 17, 1979—June 30, 1979 | $ 9,969 |
| October 5, 1979 | July 1, 1979—August 30, 1979 | $10,425 |
| January 28, 1980 | August 31, 1979—June 30, 1980 | $17,636 |
| September, 1981 | July 1, 1980—June 30, 1981 | $19,802 |

**9.** Perkins School Brief at 13–14.

**10.** The Illinois rate was $35.66 per diem. If the daily rate is applied on an annual basis, the Illinois annual rate would have been higher than the Massachusetts rate of $9,969 that had

been set on May 23, 1979 and the Massachusetts rate of $10,425 that would subsequently be set on October 5, 1979. However, the rate excluded medical and social service costs that had been allowed by Massachusetts. In fact, an error was made by the Board in the calculation of the rate; if it had been properly calculated it would have amounted to $1,300 per student less than the Massachusetts rate. *See* Perkins School Brief at 14.

**11.** As previously noted the Massachusetts Commission did increase the rate to $10,425 effective July 1, 1979 on October 5, 1979 and a

On March 31, 1980, Franklin Perkins, Jr. resigned as executive director of the School and Dr. Richard Spencer was appointed to replace him. At this time, the School was continuing to experience financial problems due in part to the fact that none of the School's twenty-six out-of-state students were paying the full Massachusetts rate of $17,636. Accordingly, the School, under Dr. Spencer's leadership, decided to take drastic steps to assure that the amount received in reimbursement from other states for their out-of-state students was equal to the maximum tuition rate set by the Massachusetts Rate Setting Commission.[12] The finance committee of the School's Board of Trustees met on June 12, 1980, to discuss this problem and concluded that the School should only accept students from states whose tuition reimbursement policy conformed with the Massachusetts tuition rate, cost analysis and program requirements. If a state's procedures did not conform with Massachusetts', that is, if they failed to produce the same rate and require similar cost information, the finance committee recommended that the School cease doing business with that state and on June 13, 1980 the School's Board of Trustees approved this recommendation. Dr. Spencer decided that since Illinois was one of the offending states, he directed the School not to apply to the State of Illinois for tuition reimbursement.

Shortly thereafter, on June 20, 1980, Dr. Spencer began to communicate the School's policy to the parents of out-of-state children. During this period, April Freeman was visiting her parents during her summer vacation period.

On June 28, 1980, Dr. Spencer telephoned the Freeman residence, spoke to Mrs. Freeman and requested that April not return to School because of the tuition reimbursement problem. Mrs. Freeman testified that Dr. Spencer told her that if she put her daughter April on the plane the next day, there would be no one to meet her at the airport. He told her that the School could no longer do business with the State of Illinois because its tuition payments were insufficient. According to Mrs. Freeman, Dr. Spencer also stated that she (Mrs. Freeman) was not really interested in April and her education, which she immediately denied. Mrs. Freeman testified that she asked Dr. Spencer not to make a final decision until Dr. Freeman could speak with Dr. Spencer, as he, Dr. Freeman, was in Houston with their son who was receiving treatment for cancer.[13]

That same afternoon or evening, Dr. Freeman telephoned Dr. Spencer. Dr. Freeman testified that Dr. Spencer told him that the School was in financial trouble due to prior mismanagement, which had to be corrected; that Illinois was not paying the full tuition; that the School had decided not to do business with the State of Illinois; and that therefore April should not return to School. Dr. Spencer recited that Dr. Freeman told him that it was not possible for April to stay at home at that time because of his son's illness and that Dr. Freeman made a special request that April be allowed to return for the summer ses-

further increase to $17,636 effective August 31, 1979 on January 28, 1980. According to his own testimony Dr. Freeman was made aware of the increase to approximately $11,600 in February, 1980. In addition the School billed Dr. Freeman for the retroactive increase in tuition for the 1979–80 academic year on November 1, 1980; however, Dr. Freeman testified that he never received that bill. The School billed him again in February and March, 1981, for the unpaid 1979–80 tuition along with the then current incidental charges.

12. The School had been advised that the acceptance of a rate lower than that set by the Massachusetts Commission might prompt that Com-

mission to reduce its own rate to an amount equal to the lowest rate paid by other states since acceptance of such a lower rate was involved in the Commission's regulations.

13. Dr. Spencer's version of the conversation was similar to Mrs. Freeman's; however, his testimony appears to reflect a less blunt exchange. For example in deposition testimony introduced at trial Dr. Spencer stated: "My recollection is that I asked that April not be returned to School for the summer session, that there were some serious problems with the funding, that until those were worked out we were requesting that April not return." Trial transcript at 472.

sion. Dr. Spencer stated that he advised Dr. Freeman that Illinois did not pay for the summer session. Dr. Freeman asked whether April could return as a private student for the summer and he agreed to pay for that session. Dr. Spencer replied that there was a continuing problem because of the $7,000 variance between the Massachusetts and Illinois yearly rates, but that under the circumstances the immediate problem was to enable April to return to School for the summer term and he agreed to allow April to return to School as a private student. He further testified that Dr. Freeman never offered in that conversation to pay the difference between the Illinois and Massachusetts rates.

As to this last point, Dr. Freeman had a different recollection of the conversation. He testified that he told Dr. Spencer that he would guarantee payment of the difference between what Illinois would pay and the School's tuition as set at $17,636, if Dr. Spencer would take April back and apply for the money due from Illinois. He also testified that Dr. Spencer told him the School would apply for Illinois aid and that he could send April back to School. In addition, Dr. Freeman stated that he volunteered to put the agreement in writing.

April returned to the Perkins School on June 29, 1980, and stayed there through the summer. Since the Freemans were still occupied with their son's medical problems, Dr. Freeman asked his sister, Mildred Levinson, and her husband to visit the Perkins School on the 1980 July 4th weekend to see April and to speak with Dr. Spencer. Mrs. Levinson testified that she told Dr. Spencer of her brother's concerns and that Dr. Spencer responded that he understood; that her brother should not worry; and that he would not cause Dr. Freeman any additional stress. She testified that Dr. Spencer did request that she have Dr. Freeman write him a letter guaranteeing payment for the difference between the

amount Illinois would pay and the School's tuition.

The summer session at the School ended about August 15, 1980. Dr. Spencer did not contact the Freemans regarding April's continued attendance at the School because he understood that they were having continuing problems due to their son's illness. According to Dr. Spencer, the School was attempting to maintain the status quo and keep April there in the hope that things could be worked out. In October of 1980, the School received a contract for the placement of April at the School from the Evanston School District.[14] Since Dr. Spencer realized that he would not get the $17,000 rate from Illinois, he decided not to sign the contract.

On that same day in October, Dr. Freeman called Dr. Spencer and requested to know why the School had not applied for reimbursement from the State of Illinois as had been agreed. Dr. Spencer reiterated the School's policy not to do business with Illinois because the state's financial support was inadequate. Dr. Spencer also emphasized that he had never received the letter that Dr. Freeman had promised to write guaranteeing payment of the difference between the Illinois and Massachusetts rate. Dr. Freeman was advised on November 10, 1980 by the Evanston School District that the Perkins School had not filed for funding approval. Dr. Spencer testified that Dr. Freeman told him that as a result of the settlement of a class action suit against Illinois concerning its system of purchasing services, full funding was available for Illinois students. Dr. Freeman again stated that he would be willing to pay the difference between the Massachusetts and Illinois rates, if the School signed the contract. He also testified that Dr. Spencer told him the School had decided to dismiss April at Christmas, 1980. Dr. Spencer, however, denied making this statement during that conversation. In Dr. Freeman's November 11, 1980, letter ad-

**14.** Note that the contract provided that costs paid by "other sources" could be *deducted* from the payments approved and paid by Illinois.

dressed to Dr. Spencer,[15] he assumed responsibility for the difference in payments due under the Illinois and Massachusetts rates.

After the November 10, 1980 phone call, Dr. Spencer undertook to determine whether more funding was available for the School from Illinois. He contacted the Evanston School District and discovered for the first time that the School was not an ISBE "approved" school and thus even if he had signed the contract Illinois would not have paid.[16] The Perkins School's consultant, Paul McLaughlin, explained to Dr. Spencer that the Illinois Review Board would not approve the School's rate as set by Massachusetts, but would approve a lower amount. The consultant also stated that even if approval was obtained, there still remained several areas of disparity between the Massachusetts and Illinois plans. He emphasized that the Illinois cost report was quite different than the Massachusetts cost report and that it would be expensive to complete the form. He also informed Dr. Spencer that if the Illinois rate was accepted, the new Illinois policy did not allow the School to charge the parents the difference between the rates.

After reconsidering the question, the School decided not to apply for the Illinois rate. Following this decision, in early December 1980, Dr. Spencer told Dr. Freeman that he could not sign the contract with the Evanston School District; that the School was not approved; and that it was unlikely that the School would seek such approval at that particular point of time. He further stated that April was welcome to stay at the School, but only as a private student, and that if they could not work something out, April probably would not be able to return after Christmas vacation. Because

of the Freemans' continuing problems with their son, April did not go home for Christmas, but stayed at the School.

On January 18, 1981, Dr. Freeman, accompanied by an attorney, met with Dr. Spencer to discuss payment of April's tuition. At the end of the conversation, Dr. Spencer once again agreed to fill out the necessary forms to seek approval of the School in Illinois. On February 9, 1981, Dr. Spencer wrote to the Illinois State Board of Education requesting approval of the School's program. The School subsequently received the forms necessary to apply for program eligibility which the School in turn submitted to the ISBE for processing. On April 7, 1981 it was advised that because the information they submitted was incomplete their application was considered deficient. Furthermore, because the school year was nearly complete, the ISBE considered the School's file closed.

In the meantime, on February 20, 1981, the School's executive committee considered April's situation. The Committee decided not to change the policy established by the School's Board on June 13, 1980, i.e., only if Illinois conformed to Massachusetts practices would the School continue to deal with Illinois. The Committee further decided that the School could not continue to provide services for which it was not reimbursed. In March of 1981, April was still at the School and the School had not been paid anything from any source for her care and education for the 1980–1981 academic year. On March 13, 1981, the School's attorney wrote Dr. Freeman requesting that either the School be reimbursed for April's expenses for the 1979–1980 year and the 1980–1981 year, [17] or April be with-

---

**15.** Dr. Freeman testified that on or about November 20, 1980 he contacted Mr. Anthony, the chairman of the School's Board of Trustees concerning the possible dismissal of April at Christmas. Mr. Anthony told Dr. Freeman not to be concerned as the School would never do a thing like that. Dr. Freeman also informed Mr. Anthony of his agreement to pay the difference between the Illinois and Massachusetts' rates if the School would apply for funds from Illinois.

**16.** As noted previously, a school seeking funding from Illinois must first have its educational program approved by the Illinois State Board of Education. It appears the School was not "approved" because it had failed to submit a complete application in time.

**17.** This amount totalled to $29,522.78. $4,679.95 of that total were for amounts that had previously been written off as bad debts by the School as neither the Freemans nor the

drawn from the School. The School's attorney reiterated that the School had decided not to seek approval in Illinois because of the administrative costs involved in preparing separate forms for Illinois. Dr. Freeman was advised that the School could retain April only if Dr. Freeman paid the School's tuition rate and reimbursed the School for losses totalling $29,522.78. The School stated that if the matter was not substantially resolved within 30 days, Dr. Freeman would be asked to withdraw April.

While the Freemans had begun planning to find a new school for their daughter in November 1980, they were not prepared to place April anywhere in late March of 1981. In a telephone conversation on April 17, 1981, and a confirming letter, the School's attorney advised Dr. Freeman's attorney that the School would return April to Evanston on April 22, 1981 if Dr. Freeman did not deliver a certified check to the School in the amount requested. Dr. Freeman thereupon traveled to Massachusetts, employed an attorney and obtained a temporary restraining order from a Massachusetts state court preventing the School from discharging April. The attorneys for the parties then negotiated an agreement providing that April would stay at the School if Dr. Freeman paid the full tuition and expenses from March 26, 1981 to the end of the school year in June. Pursuant to the agreement, Dr. Freeman paid $3,608.23 for April's education during May and June of 1981. April returned to Evanston, Illinois, on June 20, 1981 and subsequently entered another school.[18]

## II.

On appeal, the issues raised by the appellant and cross-appellant have been consolidated and listed below.

1. Whether the jury verdict finding Dr. Arthur Freeman not liable to the School for unpaid tuition, fees, and expenses for the care and education of his daughter totaling $7,290.76 and $15,776.37 for the 1979–1980 and 1980–1981 academic years is against the manifest weight of the evidence and thus the district court erred in not granting the School's motion for judgment N.O.V. or, in the alternative, a new trial?

2. Whether the jury's verdict finding the School liable to Dr. Arthur Freeman in the amount of $4,000 for breach of contract was contrary to law and against the manifest weight of the evidence?

3. Whether the district court erroneously usurped the province of the jury in granting the School's motions for directed verdict and for judgment notwithstanding the verdict with respect to the verdict in favor of Mrs. Rhea Freeman for intentional infliction of emotional distress?

4. Whether the district court erroneously usurped the province of the jury in granting the School's motions for directed verdict and judgment notwithstanding the verdict with respect to the jury's finding of liability in favor of Dr. Arthur Freeman for fraud?

5. Whether the district court erroneously usurped the province of the jury or erroneously misapplied the law in granting the School's motions for judgment notwithstanding the verdict with respect to the jury's award of $30,000 in punitive damages on Dr. Freeman's fraud claim?

6. Whether the district court erred in refusing to allow the Freemans to amend their complaint, prior to trial, to add a claim for relief under the Massachusetts Consumer Protection Act ("MCPA"), or to amend the judgment, pursuant to Fed. R.Civ.P. 59(e), to conform the pleadings to the proof?

---

Evanston School District had paid these amounts. Perkins School reply Brief at 25.

**18.** When April departed from the Dr. Franklin Perkins School the unpaid charges (which were sought at trial) for her care and education included:

| | |
|---|---:|
| unpaid tuition for 1979–80 | $ 7,290.76 |
| tuition charge for 1980–81 | 19,258.75 |
| miscellaneous charges | 125.85 |
| | $26,675.36 |
| payment made by Dr. Freeman | 3,608.23 |
| remaining balance | $23,067.13 |

7. Whether the district court erred in awarding costs to the School as a prevailing party with respect to the claims brought by the Freemans against the School?

### III.

A. Dr. Freeman's Liability for Unpaid Tuition, Fees and Expenses

1. The 1979–1980 Academic Year

On appeal, the Dr. Franklin Perkins School alleges that the jury verdict finding Dr. Freeman not liable to the School for unpaid tuition, fees and expenses for the 1979–1980 and 1980–1981 academic years is against the manifest weight of the evidence. The School asserts that the weight of the evidence demonstrates that an implied-in-fact contract was established between Dr. Freeman and the Perkins School and that the district court erred in denying of the School's motion for judgment notwithstanding the verdict or, in the alternative, a new trial.

▇▇▇ Initially, we agree with both parties' conclusion that the law of Massachusetts controls this issue.[19] The School as-

serts that an implied-in-fact contract existed between the parties making Dr. Freeman liable for the 1979–80 increase in tuition. Under Massachusetts law, an implied-in-fact contract is an agreement which is inferred from the conduct of the parties. *Grant v. Carlisle*, 328 Mass. 25, 101 N.E.2d 376, 379 (1951). It is established when a promiser's assent to the contract is manifested in conduct or surrounding circumstances such as a course of dealings, *Restatement (Second) of Contracts* § 4 comment a *(1979)*, and it contains the same elements as an express contract. "It differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of parties in the milieu in which they dealt." *In re D. Federico Co., Inc.*, 8 B.R. 888, 897 (Bankr.D. Mass.1981).

The School argues that the evidence overwhelmingly establishes an implied contract wherein Dr. Freeman agreed to pay the complete tuition for 1979–1980. In support of its position, the School points to the fact that prior to 1979–1980, Dr. Freeman paid the School for amounts not covered by Illinois or the Evanston school district. It

---

19. Conflict of laws principles indicate that Massachusetts law should govern all contract claims in this action. In diversity cases, a federal court must apply the conflict of laws principles of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Illinois conflict of law principles, the general rule is clear: when a contract is made in one state and is to be performed in another, the place of performance governs the construction and obligations of the contract. *Oakes v. Chicago Fire Brick Co.*, 388 Ill. 474, 58 N.E.2d 460, 462 (1944). However, if execution and performance of a contract are to take place in more than one jurisdiction, "the normal Illinois choice of law rule cannot function properly ...." *Adams Laboratories, Inc. v. Jacobs Engineering Co.*, 486 F.Supp. 383, 389 (1980). Thus, in *P.S. & E., Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125, 127 (7th Cir.1972) this court acknowledged that "[t]here appears to be no Illinois authority which would clearly govern such a multi-faceted situation where the performance was to occur in several states and the place of making was arguably" one of several other states. We stated that in view of Illinois prior contract law and analogous modern tort cases, we can only presume that, if faced

with this problem, Illinois would apply the "most significant contacts" rule. *Id.*

Under the "most significant contacts" analysis, courts are to examine five factors to determine which state's laws govern the transaction: "(1) the place of contracting; (2) the place of negotiations; (3) the place of performance; (4) the situs of the subject matter of the contract; and (5) the domicile, residence, place of incorporation and place of business of the parties." *Adams Laboratories Inc. v. Jacobs Engineering Co.*, 486 F.Supp. 383, 389 (1980). *See also Florida Risk Planning Consultants, Inc. v. Transport Life Ins. Co.*, 732 F.2d 593, 595 (7th Cir.1984) (Illinois courts have adopted the Rules of *Restatement (Second) of Conflicts* § 188 (1971)). In applying these factors in this case, it is apparent that Massachusetts law governs all agreements entered into between the parties to this lawsuit. We reach this conclusion because the Dr. Franklin Perkins School was located in Massachusetts; April attended school in Massachusetts fulltime except for short vacations; the application for the Illinois rate had to be made from Massachusetts; and any in-person negotiations between Dr. Freeman and the School took place in Massachusetts.

is asserted that this established a course of dealings and thus an implied-in-fact contract to pay all amounts not covered by the State of Illinois. Although we agree that a contract implied-in-fact was established between the Freemans and the School, the scope of the contract is narrower than that asserted by the School.

■ The contention that Dr. Freeman is liable for retroactive increases in tuition is not supported by the manifest weight of the evidence. It ignores the fact that Dr. Freeman had never previously been billed for a retroactive increase in tuition. Although Dr. Freeman made periodic payments to cover April's room and board, a course of dealings with regard to retroactive tuition increases had not been established and therefore could not constitute the basis of a contract implied-in-fact.

■ The School also emphasizes that contracts may be implied-in-fact where a defendant continued to use a service with full knowledge of the amount to be paid for such services. *Bates Block Associates, Inc. v. Milady's Shop, Inc.*, 3 Mass.App. 776, 333 N.E.2d 214, 215 (1975). This rationale is clearly inapplicable to the present case since it assumes that the party had full knowledge of the charges while he used the service. It is apparent from the record in this case that the Freemans were never notified of, nor could they have expected, such a large retroactive increase of $10,000 to $17,000 in tuition during the 1979–1980 school year. Although the tuition increase was approved in January 1980, the amount of this increase was not communicated to the Freemans even after the State of Illinois refused to grant an adjustment in the Illinois rate in April of 1980. The first indication the Freemans had that the School was in financial trouble was June 28, 1980, when Dr. Spencer called and informed them that April could not return to School unless a satisfactory arrangement for payment of tuition could be arranged. Even at that time Dr. Spencer did not specifically mention the amount of the retroactive increase in tuition, nor did he state the balance supposedly owed by

the Freemans. The first time that the Freemans were informed of the actual amount of the retroactive rate increase was via a bill mailed to Dr. Freeman in November of 1980. We hold no contract was implied-in-fact from continued use of the service under the circumstances presented in this case.

■ In the alternative the School argues that the weight of the evidence demonstrates that the School is entitled to payment of the balance due for the 1979–1980 tuition on a contract implied-at-law or *quantum meruit* theory. "In order to recover in quantum meruit it must appear that the work was performed under circumstances warranting a finding that the plaintiff expected that the defendant would pay for the work, that the defendant acted with that expectation and that the defendant allowed plaintiff to so act without objection." *Home Carpet Cleaning Co. v. Baker*, 1 Mass.App. 879, 307 N.E.2d 346, 347 (1974).

■ Such relief is not appropriate in this case since we are unable to find any support in the record that the School acted with the expectation that the Freemans would pay the retroactive increase in tuition. The evidence indicates to the contrary that the School officials in fact believed that the State of Illinois rather than the Freemans would increase its reimbursement rate to correspond with the retroactive increase imposed by Massachusetts. The Freemans were not billed for the increase until approximately eleven months after the fact. Moreover, they were given no opportunity to object to the rate increase or withdraw April from the School since they had no prior notice of the amount of the increase. Under these circumstances, we hold that the School has failed to establish a right to *quantum meruit* relief for the unpaid tuition, fees and expenses for the 1979–80 academic year.

The School also asserts that it is entitled to restitution on the theory that the Freemans have been unjustly enriched at the School's expense. *Restatement of Restitu-*

*tion* § 1 (1936 & 1979 Supp.). It is asserted that under Illinois law Dr. Freeman has the primary rights and duties with respect to the care, education, custody and control of his daughter, *accord Interest of Wheat,* 68 Ill.App.3d 471, 25 Ill. Dec. 7, 386 N.E.2d 278, 282 (1st Dist.1979), and that since the School discharged those duties for him, equity requires that he reimburse the School for the value of the services rendered.

 However, it is well established that "he who comes into equity must come with clean hands." *Weintraub v. L & F Realty Co.,* 331 Mass. 711, 122 N.E.2d 379, 381 (1954); Dobbs, *Remedies* § 2.4 at 45 (1973). Under the circumstances, it is clear that the School was attempting to penalize the Freemans for its own negligence and inattention to the application requirements that must be fulfilled in order to be reimbursed by the State of Illinois.

When the Illinois rate was set on August 22, 1979, the School was notified that any appeals of the rate must be made within 60 days. The School knew that the Massachusetts rate was likely to be increased during the course of the school year and yet it made no effort to notify the Illinois Review Board that an increase might be required. The School submitted an application for an administrative adjustment to increase its Massachusetts rate in mid-October of 1979. At that point in time, no effort was made to apply for a similar rate adjustment in Illinois. The School apparently disregarded the 60-day appeal period. Although the School may have discharged a duty that Dr. Freeman was legally obligated to perform, we deem it would be manifestly unfair to charge Dr. Freeman for costs incurred because of the negligence and simple inattention to detail on the part of the Perkins School. We, therefore, hold that the weight of the evidence does not demonstrate that the elements of (1) a contract implied-in-fact or (2) a contract implied-in-law have been established with respect to Dr. Freeman's liability for the retroactive increases in tuition for the 1979–80 academic year.

 Thus, we hold that the district court properly denied the School's motion for judgment notwithstanding verdict[20] and, in the alternative, a new trial.[21]

2. The 1980–1981 Academic Year

The School also asserts that the jury verdict finding Dr. Freeman not liable to the School for unpaid tuition, fees and expenses for his daughter for the 1980–1981

---

20. The Seventh Circuit has consistently held that in diversity cases the state law standard for judgment notwithstanding verdict is to be applied. *See Robison v. Lescrenier,* 721 F.2d 1101, 1103 (7th Cir.1983); *Hempel & Co. v. Metal World,* 721 F.2d 610, 613 (7th Cir.1983); *Kuziw v. Lake Engineering Co.,* 586 F.2d 33, 35 (7th Cir.1978); *Kudelka v. American Hoist & Derrick Co.,* 541 F.2d 651, 654 (7th Cir.1976). (There is, however, authority which takes the contrary position that federal courts apply the federal rather than state test for determining the sufficiency of the evidence on a motion for directed verdict or for judgment n.o.v. *See Foster v. Ford Motor Co.,* 616 F.2d 1304, 1308 (5th Cir.1980); *Oldenburg v. Clark,* 489 F.2d 839, 841 (10th Cir.1974)).

In Massachusetts, the standard for determining whether to grant a party's motion to enter judgment notwithstanding the verdict is the same as in the case of a motion for a directed verdict. *Kraus v. Webber,* 359 Mass. 565, 270 N.E.2d 789, 790 (1971). Such a motion can prevail only where considering the evidence most favorably to the non-moving party, it is still insufficient to support a verdict in his favor. *DiMarzo v. S & P Realty Corporation,* 364 Mass. 510, 306 N.E.2d 432, 435 (1974). Such was not the case here. The evidence was sufficient to warrant the jury in finding that Dr. Freeman was not liable to the School for the retroactive increase in tuition for the 1979–80 academic years.

21. As for the School's request for a new trial, we stated in *Robison v. Lescrenier,* 721 F.2d 1101 (7th Cir.1983) that, "[i]n contrast to a motion for judgment n.o.v., the standard for reviewing a trial court's disposition of a motion for a new trial is controlled by federal law, even in diversity cases .... Since 'a motion for a new trial is addressed to the sound discretion of the trial judge', ... the standard of review is abuse of that discretion." *Id.* at 1104 (citation omitted). As we stated above, the evidence was sufficient for the jury to find that Dr. Freeman was not liable to the Dr. Franklin Perkins School for unpaid tuition, fees and expenses for the 1979–80 academic year and, therefore, the district court did not abuse its discretion in denying the School's motion for a new trial.

academic year was against the manifest weight of the evidence. The School argues that the evidence demonstrates an implied-in-fact contract between Dr. Freeman and the Perkins School and that the district court erred in denying the School's motion for a judgment notwithstanding the verdict or, in the alternative, a new trial.

Dr. Franklin Perkins School asserts that Dr. Freeman had a continuing obligation to cover any amounts that the State of Illinois did not cover with regard to April's care and education. Although we rejected this reasoning with regard to the retroactive tuition increase imposed in 1979–1980, a different situation existed with regard to the 1980–1981 school year. Dr. Freeman was notified on June 28, 1980 that there was a problem with obtaining full reimbursement from Illinois. The course of dealings between the parties changed in that telephone conversation when Dr. Freeman stated that he would assume responsibility for the difference between the Massachusetts rate and the Illinois reimbursement. Although Dr. Spencer testified that Dr. Freeman never expressly agreed to pay the difference between the Massachusetts and Illinois rate for the 1980–1981 school year, Dr. Freeman's testimony that he did agree to pay the difference in tuition rates, subsequent communications between Dr. Freeman and the School, including Mildred Levinson's conversation with Dr. Spencer over the July 4, 1980 weekend, and the fact that Dr. Freeman returned April to School with full knowledge that the School was experiencing difficulty in obtaining full reimbursement for tuition from Illinois and that the tuition had been increased and would continue to increase, indicate that an implied-in-fact contract existed as of June 28, 1980 to furnish April with an education at the Perkins School at the increased cost.

Although Dr. Freeman admits that a contract existed as a result of the June 28, 1980 conversation, he asserts that the School's breach of this contract disposed of his obligations to pay for any of the 1980–1981 school year tuition. Dr. Freeman contends the terms of the agreement were that Dr. Spencer was to allow April to

continue at the Perkins School and the School was to apply for reimbursement from Illinois, while Dr. Freeman would pay the full tuition for the summer session and the difference between the Illinois and Massachusetts rates for the normal 1980–1981 school year. Dr. Freeman argues that the School's failure to apply for reimbursement from Illinois constituted a material breach of the June 28, 1980 agreement, and thus Dr. Freeman was discharged from the obligation to perform any conditions under the contract.

We reject this contention. The evidence, even when considering it most favorably to Dr. Freeman, is insufficient to support a verdict finding him not liable to the School for any portion of the unpaid tuition, fees and expenses for the 1980–1981 academic year. Although the School failed to apply for reimbursement from the State of Illinois, failure of a term or condition of an agreement does not necessarily relieve a party from his obligation to perform unless it materially alters the contract. Here, the essence of the contract was that the School promised to provide for the care and education of April while Dr. Freeman agreed to pay for that portion not reimbursed by the State of Illinois. One of the "conditions" of the contract was for the School to apply for the aid. The failure of the School to do so did not deprive Dr. Freeman of any benefit under the contract since the School continued to educate and care for April. *See Restatement (Second) of Contracts,* §§ 237, 241(a). Thus, any claimed "breach" of the contract by the School in not applying for aid was not a material breach which would excuse Dr. Freeman from rendering his promised performance. The fact that the School did not apply for reimbursement from Illinois does not alter Dr. Freeman's obligation to pay the full tuition for the 1980 summer session and the difference between the Illinois and Massachusetts rates for the 1980–1981 school year. In contrast to our earlier holding where we stated that there was no evidence demonstrating the Freemans had assumed any obligation for the increase

tuition, here Dr. Freeman admits that he agreed to pay for the difference in tuition for the 1980–1981 academic year. We, therefore, reverse the district court on this issue and remand for a determination of the amount Dr. Freeman would have been obligated to pay had the School applied for reimbursement from Illinois.[22]

B. Dr. Franklin Perkins School's Liability For Breach of Contract

The Dr. Franklin Perkins School argues that the district court erred in denying its motion for a directed verdict and for judgment notwithstanding the verdict with respect to the jury verdict finding the School liable to Dr. Freeman for breach of contract in the amount of $4,000 based on Dr. Spencer's failure to apply and obtain tuition reimbursement from Illinois as agreed in the June 28, 1980 telephone conversation. It asserts that such a verdict was contrary to the law and against the manifest weight of the evidence.

This motion for a directed verdict or in the alternative judgment notwithstanding the verdict can prevail only where considering the evidence most favorably to the non-moving party, it is still insufficient to support a verdict in his favor. *DiMarzo v. S & P Realty Corporation*, 364 Mass. 510, 306 N.E.2d 432, 435 (1974). Considering the evidence most favorably to Dr. Freeman, the judge's denial of the motions for directed verdict and for judgment notwithstanding the verdict on the breach of contract claim must be upheld since there is sufficient evidence to sustain a finding that the School breached a term of the June 28, 1980 oral contract when it neglected to apply for tuition reimbursement from Illinois.

 Although, as stated earlier in this opinion, this was not a material breach, Dr. Freeman still may recover those damages incurred in order to enforce performance of the contract, *see Louise Caroline Nursing Home Inc. v. Dix Construction*

*Corp.*, 362 Mass. 306, 285 N.E.2d 904, 907–908 (1972), and is entitled to be reimbursed for any loss which occurred as a natural and probable consequence of the breach of contract. In this case the plaintiffs contend that the $4,000 damage award, consisting of travel and lodging costs, lost consulting fees and attorney expenses is the natural and probable result of the breach. The rule of damages in Massachusetts for breach of contract is that the injured party is entitled to damages sufficient to compensate him for the loss actually sustained and to put him in the same position he would have been in had the contract been performed. He is not entitled to extraordinary or unforeseen damages, but only to that loss which occurred as a natural and probable consequence of the breach and which was in contemplation of the parties at the time the contract was entered. *Whitespot Construction Co. v. Jet Spray Cooler, Inc.*, 344 Mass. 632, 183 N.E.2d 719, 722 (1962); *Boylston Housing Corp. v. O'Toole*, 321 Mass. 538, 74 N.E.2d 288, 302 (1947). *See also Restatement (Second) Contracts* § 351 (1979).

 Under this analysis, Dr. Freeman is entitled only to the value of the contract, that is, what he would have received had the contract been performed. Any incidental loss must follow as a natural consequence of the breach and have been reasonably contemplated by the parties as being an approximate result of the breach. A party cannot be awarded damages that would put him in a better position than if the contract had been completely carried out. *Louise Caroline Nursing Home, Inc.*, 362 Mass. 306, 285 N.E.2d at 907; *Abrams v. Reynolds Metals Co.*, 340 Mass. 704, 166 N.E.2d 204, 207 (1960); *Eastern Advertising Co. v. Shapiro*, 263 Mass. 228, 161 N.E. 240, 242 (1928). Based on the foregoing damage principles, we hold there was insufficient evidence to support the award of damages to Dr. Freeman

**22.** Pursuant to the understanding of June 28, 1980, the amount owed would apparently be the difference between the then $17,636 tuition rate

and the amount that the School could have received from Illinois had it properly applied for aid.

for the loss of 3 days consulting fees and attorney expenses.

Initially, the inclusion of lost consulting fees as an element of damages under these facts is unwarranted. Dr. Freeman's inability to work three additional consulting days during an entire year, 1980–1981, was not a natural consequence of the School's failure to obtain tuition reimbursement from the State of Illinois. Compensation for such injury could not have reasonably been contemplated by the parties as an approximate result of a dispute between the School and the Freemans over April's tuition. Further, our review of the record discloses that there is insufficient evidence to support Dr. Freeman's claim that he would have performed the consulting services if he had not had to travel on those given days to Massachusetts to discuss April's withdrawal from the School with Dr. Spencer. Dr. Freeman spent most of the second half of 1980 in Houston with his son while he received cancer treatments and any loss of consulting time is more likely attributable to this than to the School's breach of contract. Therefore, the damages for loss of consulting fees are denied.

■■■ Second, under Massachusetts law, attorney fees are not ordinarily recoverable as an element of damage. In this case, the attorney fees were incurred for legal proceedings in connection with obtaining an injunction against the School. The plaintiff in its brief argues that his expenses, including the attorney fees, are part of his contract damages; however, he never attempts to reconcile that position with Massachusetts law denying the award of attorney fees except in limited situations. We believe it is best to view these fees as the cost of pursuing a claim rather than as an element of damages. Otherwise, this Court may open a veritable pandora's box for many other such contract actions and thus create a large gap in the narrowly tailored Massachusetts exceptions. Expansion of these exceptions is

best left to the Massachusetts courts. Thus, in Massachusetts recovery of attorney fees is allowed only in limited circumstances such as:

(a) in accordance with specific statutory provisions of court rules;

(b) pursuant to a valid contractual provision or stipulation; or

(c) as damages in certain exceptional circumstances, such as a case of malicious prosecution. *See Chantrand v. Riley,* 354 Mass. 242, 237 N.E.2d 10, 11 (1968).

*Fuss v. Fuss,* 372 Mass. 64, 368 N.E.2d 271, 274 (1977); *see also Bournewood Hospital, Inc. v. Massachusetts Commission Against Discrimination,* 371 Mass. 303, 358 N.E.2d 235, 238, 240 (1976). We hold there was insufficient, if any, evidence that the attorney fees included in Dr. Freeman's damage award met any of the exceptions listed above. In this situation, the rule in Massachusetts is that a litigant must bear the expense of pursuing his claim.

■■■ To the extent that the decision of the district court awarded damages for lost consulting fees and attorney fees, it is reversed. However, to the extent that the award consisted of Dr. Freeman's travel and lodging costs to enforce the School's promise to keep April at the School pursuant to the June 28, 1980 contract, as this expense was a natural and probable consequence of the contract breach, the judgment is affirmed.

C. Mrs. Freeman's Claim of Intentional Infliction of Emotional Distress

■■■ The Freemans assert that the district court erred in granting the Dr. Franklin Perkins School's motion for a directed verdict and judgment notwithstanding the verdict with regard to Mrs. Freeman's claim for intentional infliction of emotional distress. In a tort action in diversity, Illinois also applies the "most significant contacts" test in determining which state's law applies. *Ingersoll v. Klein,* 46 Ill.2d 42, 262 N.E.2d 593, 596 (1970).[23] Under this

23. Important contacts, which may be con-

sidered in determining the state of the most

approach, Massachusetts law governs this claim.

 According to Massachusetts law the necessary elements of the tort of intentional infliction of emotional distress are: (1) the actor must intend to inflict emotional distress; (2) the conduct must be extreme and outrageous; (3) it must cause the plaintiffs emotional stress; and (4) the emotional distress must be severe. *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315, 318–19 (1976). Upon review of the record, it becomes apparent that the evidence is insufficient to prove the necessary elements of the tort of intentional infliction of emotional distress.

 First, there is insufficient evidence to establish that Dr. Spencer intended to cause emotional distress to Rhea Freeman. When Dr. Spencer called the Freeman home on June 28, 1980, he had no prior contact with Mrs. Freeman and had no reason to expect that he would be speaking to her. He did not know of her son's illness or of any of the other circumstances causing stress in Mrs. Freeman's life. Dr. Spencer testified that the purpose of his call on June 28, 1980 was to request that April not be returned to School in light of the fact that Illinois' tuition reimbursement program was not covering the costs of April's education. There was no evidence that the purpose of Dr. Spencer's call was to inflict emotional distress upon Mrs. Freeman. In fact, after Dr. Spencer was informed that Dr. Freeman handled such matters, all of Dr. Spencer's contacts were with Dr. Freeman. No one at the School had any further contact with Mrs. Freeman until June of 1981 when arrangements were made for April to return home.[24]

 Second, we hold that the conduct of the employees of the Dr. Franklin Perkins School toward Mrs. Freeman was neither extreme nor outrageous. Under Massachusetts law, conduct is not extreme and outrageous unless it is beyond all bounds of decency and utterly intolerable in a civilized community. *Agis*, 371 Mass. 140, 355 N.E.2d at 318–19. The School's conduct certainly does not rise to this level. Again, Dr. Spencer's only direct contact with Mrs. Freeman was in the telephone conversation of June 28, 1980. Any ill-advised comments made during the course of that conversation were not of the magnitude to be considered beyond all bounds of decency and utterly intolerable in a civilized community. Dr. Spencer's statement that if April was put on a plane to Boston, there would be no one there to meet her when she arrived in Boston was clarified during the course of their conversation. Although Mrs. Freeman found this comment upsetting, it cannot be described as extreme and outrageous conduct. Furthermore, Dr. Spencer's or the School's indirect contact with Mrs. Freeman via Dr. Freeman, in an effort to resolve the tuition problems, was not extreme and outrageous conduct. The evidence also does not support the Freemans' claims that in the spring of 1981 the School threatened to expel April and place her alone on a plane to Chicago. The Freemans were merely advised that April Freeman would be returned to Evanston on or about April 22, 1981 if Dr. Freeman did not pay the amount claimed by the School. Furthermore, except for discussions between Dr. Freeman and the School during April, 1981, whenever the possibility arose that April

---

significant relationship, include: "(1) the place where the injury occurred; (2) the place where the conduct occurred; (3) the domicile, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship of the parties is centered." *Ingersoll*, 46 Ill.2d 42, 262 N.E.2d at 597. Although the injury occurred in Illinois, the conduct was committed in Massachusetts, the school was located and incorporated in Massachusetts and on the whole the relationship between the parties was centered in Massachusetts.

24. The plaintiffs claim in their brief that the School intended to cause emotional distress to the parents in order to force payment. We note, however, that it was logically inconsistent for the jury to dismiss Dr. Freeman's emotional distress claim where he was the party who had the most, if not almost exclusive, contact with the School, while finding that the School intended to cause Mrs. Freeman emotional distress.

would be requested to withdraw, the School accommodated Dr. Freeman's request to reconsider its position. It did so because of its respect for the family situation in light of the Freemans' son's illness.

■ Although the School's handling of this matter in an attempt to collect its tuition could not always be characterized as gracious, much less as the use of good judgment, it certainly falls far short of an intentional tort to inflict emotional distress. In Massachusetts, intentional infliction of emotional distress is generally considered to be an attempt to intentionally shock and harm a plaintiff. It usually involves repeated harrassment. *See, e.g., Boyle v. Wenk,* 378 Mass. 592, 392 N.E.2d 1053 (1979); *George v. Jordan Marsh Co.,* 359 Mass. 244, 268 N.E.2d 915 (1971). From the evidence presented, it is clear that Dr. Spencer did not intend to cause Mrs. Freeman emotional distress and that his conduct toward her was neither extreme nor outrageous. Under the circumstances, the district court was correct in granting the School's motion for a directed verdict and judgment notwithstanding the verdict with respect to Mrs. Freeman's claim for intentional infliction of emotional distress.

D. Dr. Freeman's Claim of Fraud

The Freemans assert that the district court erroneously usurped the province of the jury in granting the Dr. Franklin Perkins School's motion for judgment notwithstanding the verdict with respect to the jury's decision in favor of Dr. Freeman on his fraud claim. Dr. Freeman argues that his claim of fraud is supported by either of two alleged misrepresentations: (1) Dr. Spencer's promise to apply to Illinois for aid on June 28, 1980 when he had no intention to apply; or (2) Dr. Spencer's failure to inform to Dr. Freeman on June 28, 1980 of the School's formal decision not to apply for Illinois aid.

■ Again Massachusetts law governs the disposition of this claim since under the "most significant contacts" rule, Massachusetts had the most significant relationship to the occurrence. Although Dr. Freeman

was in Texas at the time this phone conversation took place, the conduct which allegedly caused the injury occurred in Massachusetts. Furthermore, as we stated earlier in this opinion, the relationship of the parties to this dispute is centered in Massachusetts. *See supra* note 19 and 23. The School is located and incorporated in Massachusetts and April attended school in Massachusetts.

■ Under Massachusetts law, fraud is defined "as a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Slaney v. Westwood Auto Inc.,* 366 Mass. 688, 322 N.E.2d 768, 779 (1975). With respect to Dr. Freeman's first assertion, it is important to note that Dr. Spencer's statement that the School would apply for Illinois aid was not a false representation of a material existing fact. It was promissory in nature and directed at future conditions. A promise alone cannot furnish the basis for an action of fraud or deceit unless the defendant, at the time the promise was made, had no intention to carry it out. *Turner v. Johnson & Johnson,* 549 F.Supp. 807, 812 (D.Mass.1982); *Barrett Associates, Inc. v. Aronson,* 346 Mass. 150, 190 N.E.2d 867 (1963).

■ Dr. Freeman asserts that it was the jury's function to determine whether Dr. Spencer had an intention, when the statement was made, not to carry out the promise. While this characterization of the jury's role is generally correct, in the present case, no evidence was presented to support the contention that Dr. Spencer *did* not intend to perform his promise. The result of the conversation between Dr. Freeman and Dr. Spencer on June 28, 1980 does not demonstrate that Dr. Spencer never intended to perform. Dr. Freeman, who was to put his guarantee in writing, did not put his guarantee in writing until November, 1980. Dr. Spencer, who was to apply for aid, never applied, apparently because

he came to the conclusion early in the fall of 1980 that the School may still not have been fully reimbursed under the contract terms submitted by the Illinois Board. *See supra* note 14. Further, subsequent attempts to apply for aid were made in November, 1980 and February, 1981, although these attempts were apparently bungled by the School. However, Dr. Spencer's obvious intent was to accommodate Dr. Freeman's wish to have April return to and remain in School. Under these circumstances, in the absence of any evidence that Dr. Spencer never intended to apply for Illinois aid, the School cannot be said to have acted to defraud Dr. Freeman.

 Dr. Freeman's second argument, that Dr. Spencer failed to disclose that the School previously had decided not to apply for Illinois aid, is also unsupported by the evidence since Dr. Spencer informed the Freemans of the substance of the School's new policy to stop doing business with the State of Illinois during their first phone conversation on June 28, 1980. Having told Dr. Freeman of the substance of the policy, it is obvious that Dr. Spencer did not intend to mislead him.

 Dr. Freeman also failed to establish that either of the alleged misrepresentations were made for the purpose of inducing him to act. Dr. Spencer called the Freeman residence on June 28, 1980 for the purpose of requesting that April *not* return to School. In their conversation, Dr. Freeman sought to sooth the troubled waters of conflict in order that April might return to the School. In so doing, he proposed that the School apply for Illinois aid. Dr.

Spencer's reluctant agreement to apply for Illinois tuition reimbursement pursuant to Dr. Freeman's request certainly cannot be considered misrepresentations made for the purpose of inducing another to act.

 In conclusion, there is no evidence that Dr. Spencer did not intend to perform the promise to apply for Illinois tuition reimbursement at the time it was made. Although it is not generally the function of a judge to sit as a thirteenth juror and thereby attempt to evaluate the intent of a party who is alleged to have made a misrepresentation, a court has a duty to grant a motion for judgment notwithstanding the verdict when there is insufficient evidence to support the verdict. *DiMarzo v. S & P Realty Corporation*, 364 Mass. 510, 306 N.E.2d 432, 435 (1974). The district court's decision to grant judgment notwithstanding the verdict with respect to the verdict on liability in favor of Dr. Freeman for fraud is affirmed.[25]

**E. Dr. Freeman's Award of Punitive Damages With Respect to the Claim of Fraud**

 On appeal, the Freemans also assert that the district court erroneously usurped the province of the jury and misapplied the law in granting the School's motion for judgment notwithstanding the verdict on damages with respect to the jury's award of $30,000 in punitive damages on Dr. Freeman's fraud claim. Dr. Freeman asserts that the law of Illinois with regard to punitive damages applies.[26] *See In re Aircrash Disaster Near Chicago, Illinois,*

25. On appeal the School asserts that it has statutory immunity from tort liability in excess of $20,000 under Massachusetts law since it is a charitable corporation. *See* Mass.Gen. Laws ch. 231, § 85K. Pursuant to the Massachusetts statute, the tort liability of a charitable corporation is limited to $20,000, exclusive of interest and costs, if the tort was committed in the course of an activity carried on to accomplish directly the charitable purposes of the corporation. Mass. Gen. Laws, ch. 231, § 85K. This limitation of liability does not apply if the tort was committed in the course of activities that are primarily commercial in character.

There is insufficient evidence in the record to determine if the School committed a tort in the course of activities that are primarily commercial in character. However, under the circumstances, the resolution of this issue is not required since the School has not been found liable in tort.

26. It has been consistently held that punitive or exemplary damages are not allowed in the commonwealth of Massachusetts unless they are expressly authorized by statute. *See, e.g., Schiller v. Strangis,* 540 F.Supp. 605, 624 (D.Mass.1982); *City of Lowell v. Massachusetts Bonding & Ins. Co.,* 313 Mass. 257, 47 N.E.2d 265, 272 (1943).

644 F.2d 594 (7th Cir.), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981). Illinois permits an award of punitive damages whenever conduct is shown to have occurred with wantonness, malice, oppression or other circumstances of aggravation. *Getschow v. Commonwealth Edison Co.,* 111 Ill.App.3d 522, 67 Ill.Dec. 343, 444 N.E.2d 579, 587–588 (1st Dist. 1982); *Four "S" Alliance, Inc. v. American National Bank,* 104 Ill.App.3d 636, 60 Ill.Dec. 314, 432 N.E.2d 1213, 1217 (1st Dist.1982); *Allabastro v. Cummins,* 90 Ill. App.3d 394, 45 Ill.Dec. 753, 413 N.E.2d 86, 89 (1st Dist.1980).

We, however, do not reach the question of which state's law applies with regard to punitive damages since Dr. Freeman has failed to show sufficient evidence to support his claim of fraud. Since the punitive damage award rests upon the fraud claim which was overturned by the district court and whose decision on that count is affirmed by this court, the punitive damage award cannot stand. Fraud is an intentional tort and an award of punitive damages requires intentional conduct. Because the evidence in this case does not support the fraud claim, it cannot support the punitive damage award. Punitive damages are not an independent cause of action. They represent a specific type of relief. *See* Ghiardi & Kircher, *Punitive Damages* § 6.17 at 63 (1983). Therefore, the district court's decision granting the School's motion for judgment notwithstanding the verdict on punitive damages of $30,-000 for fraud was proper and is accordingly affirmed.

### F. The Freeman's Claim for Relief Under the Massachusetts Consumer Protection Act

On appeal, the Freemans also assert that the district court erred in refusing to allow them, (1) to amend their complaint prior to trial in order that they might add a claim for relief under the Massachusetts Consumer Protection Act ("MCPA") and, (2) to amend the judgment, pursuant to Fed.R. Civ.P. 59(e) to conform the pleadings to the proof presented at trial.

The MCPA declares unlawful any "unfair method of competition and unfair or deceptive trade acts or practices in the conduct of any trade or commerce." MCPA § 2(a). The Freemans assert that trade or commerce includes the sale of services and that the School sold a service for the care and education for April to Dr. Freeman. Further, since the jury found the School committed common law fraud during the course of that sale, the Freemans contend that the School's conduct qualifies as a deceptive practice under the Act.

Because we have upheld the district court's decision to grant judgment notwithstanding the verdict with regard to the School's liability to Dr. Freeman for fraud, the School's conduct does not come within the meaning of the Act, and any possible abuse of discretion in the district court's refusal to allow the Freemans to amend their complaint is, at most, harmless error. Thus, we affirm the district court and do not reach the issue of whether the educational and custodial services performed by a not-for-profit institution qualifies as trade or commence within the meaning of the statute.

### G. The District Court's Award of Costs Against the Freemans

On appeal the Freemans assert that the district court erred in awarding costs to the School pursuant to 28 U.S.C. § 1332(b).[27] The district court taxed costs against the Freemans in the action they brought

---

**27.** 28 U.S.C. § 1332(b) provides:

"Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who filed the case originally in the federal courts is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and cost, the district court may deny cost to the plaintiff and in addition, may impose costs upon the plaintiff."

against the School because the judgment of $4,000 in favor of Dr. Freeman was less than the $10,000 jurisdictional amount necessary in an action based on diversity of citizenship.

The statute's language does not require the district court to determine whether the party brought its claim in good faith; however, the legislative history and case law interpreting this statute indicate that good faith is a factor that the district court should consider when deciding whether to impose costs.[28] *See Bochenek v. Germann,* 191 F.Supp. 104 (E.D.Mich.1960); *Stachon v. Hoxie,* 190 F.Supp. 185, 186 (W.D.Mich.1960). Our review of the record in this case convinces us that the Freemans, although not establishing the requisite elements of their various claims, did not assert those claims in bad faith. When the statute gives the district court judge the discretion to impose costs, the reasons supporting that determination should be stated. No reasons were stated in the present case, except for the fact that the Freemans did not establish the requisite jurisdictional amount. We do not feel that the facts of this case justify imposition of costs as punishment simply because the jurisdictional amount was not established.

### IV. CONCLUSION

We reverse with respect to Dr. Freeman's contractual liability and remand for a determination of the extent of such liability; we reverse with respect to that portion of the damage award which includes loss of consulting fees and attorneys fees; we reverse the award of costs; and, we affirm in all other respects.

28. The Senate Committee on the Judiciary stated:

"To make the $10,000 limitation a forceful one and to prevent inflated claims, the House Judiciary Committee has inserted a subsection permitting the trial judge to either withhold costs and/or impose costs on the plaintiff if the plaintiff fails to obtain a judgment for at least the jurisdictional amount. This provision will apply only to amounts determined by a verdict or a final judgment decided by the court; not to compromise agree-

ments. *In deciding whether to deny costs and/or to impose costs on the plaintiff, the court will undoubtedly take into consideration whether the amount claimed was made in good faith or whether it was made simply to get into Federal court.* It will also take into consideration the fact, if it be a fact, that the plaintiff's net recovery has been reduced by setoff or counterclaim, the validity of which the plaintiff contested in good faith."
S.Rep. No. 1830, 85 Cong., 2d Sess. *reprinted in* 1958 U.S.Code & Ad.News 3099, 3103.