**BALTIMORE ORIOLES, INC., et al.,**
**Plaintiffs-Appellees,**

v.

**MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, a labor organization and an unincorporated association consisting of the Major League Baseball Players, Defendant-Appellant.**

No. 85–2020.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1986.
Decided Oct. 29, 1986.

James W. Quinn, Weil, Gotshal & Manges, New York City, for defendant-appellant.

Louis L. Hoynes, Katten, Muchin, Zavis, Pearl & Galler, Chicago, Ill., for plaintiffs-appellees.

Before COFFEY and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

The primary issue involved in this appeal is whether major league baseball clubs own exclusive rights to the televised performances of major league baseball players during major league baseball games. For the reasons stated below, we will affirm in part, vacate in part, and remand for further proceedings.

I

This appeal arises out of a long-standing dispute between the Major League Baseball Clubs ("Clubs") and the Major League Baseball Players Association ("Players") regarding the ownership of the broadcast rights to the Players' performances during major league baseball games. After decades of negotiation concerning the allocation of revenues from telecasts of the games, the Players in May of 1982 sent letters to the Clubs, and to television and cable companies with which the Clubs had contracted, asserting that the telecasts were being made without the Players' consent and that they misappropriated the Players' property rights in their performances. The mailing of these letters led the parties to move their dispute from the bargaining table to the courtroom.

On June 14, 1982, the Clubs filed an action (entitled *Baltimore Orioles, Inc. v. Major League Baseball Players Association*, No. 82 C 3710) in the United States District Court for the Northern District of Illinois, in which they sought a declaratory judgment that the Clubs possessed an exclusive right to broadcast the games and owned exclusive rights to the telecasts. Each count sought essentially the same relief, but was premised upon a different theory: Count I was based upon copyright law, in particular the "works made for hire" doctrine of 17 U.S.C. § 201(b); Count II rested upon state master-servant law; Count III was predicated upon the collective bargaining agreement between the Clubs and the Players, including the Uniform Player's Contract; and Count IV was

based upon the parties' customs and dealings.

On July 1, 1982, three major league players brought an action (entitled *Rogers v. Kuhn*, No. 82 C 6377) against the Clubs in the United States District Court for the Southern District of New York. The three players (whom we also refer to as the "Players") sought a declaration that the game telecasts misappropriated their property rights in their names, pictures, and performances, and also asked for damages and injunctive relief. The *Rogers* complaint asserted six claims for relief, based upon the Players' alleged property rights in their names, pictures, and performances, the doctrine of unjust enrichment, and sections 50 and 51 of the New York Civil Rights Statute, N.Y.Civ.Rights Law §§ 50–51. After the district court in Chicago denied a motion to transfer the *Baltimore Orioles* action to New York, the parties stipulated to a transfer of the *Rogers* suit from New York to Chicago, and to consolidation of the two cases.

The parties moved for summary judgment on Counts I and II of the *Baltimore Orioles* complaint, which concerned the Clubs' copyright and master-servant claims. On May 23, 1985, the district court granted the Clubs summary judgment on these two counts. *See Baltimore Orioles, Inc. v. Major League Baseball Players Association*, Copyright L.Dec. (CCH) ¶ 25,822 (N.D.Ill.1985) [Available on WESTLAW, DCTU database]. On June 14, 1985, the Players filed a notice of appeal from the grant of summary judgment for the Clubs in the *Baltimore Orioles* action.

## II

### A. *Appellate Jurisdiction*

Before proceeding to the merits, we must pause to consider whether we have jurisdiction over this appeal. 28 U.S.C. § 1291 grants the courts of appeals "jurisdiction of appeals from all final decisions of the district courts of the United States." It is axiomatic that § 1291 is jurisdictional, *see,*

*e.g., Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 760 F.2d 177, 180 (7th Cir.1985), that appellate jurisdiction cannot be conferred by consent of the parties, *see, e.g., Kaszuk v. Bakery & Confectionary Union & Industry International Pension Fund*, 791 F.2d 548, 552 (7th Cir.1986), and that this court has the right, indeed the duty, *sua sponte*, to ascertain whether we possess jurisdiction over an appeal, *see, e.g., Christianson v. Colt Industries Operating Corp.*, 798 F.2d 1051, 1055–56 (7th Cir.1986); *In re Barker*, 768 F.2d 191, 192 (7th Cir.1985); *Motorola, Inc. v. Computer Displays International, Inc.*, 739 F.2d 1149, 1153 (7th Cir.1984).

In this case, the district court's May 23, 1985, order granted summary judgment for the Clubs on two of the four counts in the *Baltimore Orioles* complaint. Although the May 23 order did not expressly grant judgment on the remaining two counts in the *Baltimore Orioles* complaint or on any of the counts in the *Rogers* complaint, the district court on the same day entered judgment for the Clubs and against the Players in both actions.[1] During oral argument we raised the issue of our appellate jurisdiction to determine whether the May 23 order was an appealable final decision. In response to our inquiry, the parties submitted an amended judgment order dated January 27, 1986, expressly dismissing the *Rogers* complaint and Counts III and IV of the *Baltimore Orioles* complaint *nunc pro tunc* to May 23, 1985.

In general, a decision is final for the purpose of § 1291 if it ends the litigation on the merits and leaves nothing for the district court to do but execute the judgment. *See Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 373, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981); *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945); *St. Louis, Iron Mountain & Southern Railroad v. Southern Express Co.*, 108 U.S. 24, 28–29, 2 S.Ct. 6, 8, 27 L.Ed. 638 (1883). Judged by

---

1. Judgment was entered on a separate document as required by Fed.R.Civ.P. 58.

this standard, the district court's May 23 order was a final decision because it effectively terminated the litigation on the merits. It is true that the May 23 order did not explicitly grant judgment on Counts III and IV of the *Baltimore Orioles* complaint and on each of the counts in the *Rogers* complaint; however, as the amended judgment order makes clear, the parties had abandoned those claims. We have held that an order that effectively ends the litigation on the merits is an appealable final judgment even if the district court did not formally enter judgment on a claim that one party has abandoned. *See American National Bank & Trust Co. of Chicago v. Bailey,* 750 F.2d 577, 580–81 (7th Cir.1984), *cert. denied,* 471 U.S. 1100, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985); *see also American Family Mutual Insurance Co. v. Jones,* 739 F.2d 1259, 1261 n. 1 (7th Cir.1984). We therefore conclude that the May 23 order was an appealable final decision from which the Players filed a timely notice of appeal. Hence, we have jurisdiction to decide this dispute.

### B. *Copyright Claim*

The Clubs sought a declaratory judgment "that the telecasts of Major League Baseball games constitute copyrighted 'works made for hire' in which defendant and Major League Baseball players have no rights whatsoever." *Baltimore Orioles* Complaint, Prayer for Relief ¶ 1. The district court found that the Clubs, not the Players, owned a copyright in the telecasts as works made for hire and that the Clubs' copyright in the telecasts preempted the Players' rights of publicity in their performances. *See Baltimore Orioles,* 1985

Copyright L.Dec. at 19,732. Accordingly, it granted summary judgment and entered final judgment for the Clubs on this claim. The Players argue that the district court erred in holding that a baseball player's live performance, as embodied in a copyrighted telecast of the game, constitutes a work made for hire so as to extinguish the player's right of publicity in his performance.[2]

### 1. *Works Made for Hire Under 17 U.S.C. § 201(b)*

■ Our analysis begins by ascertaining whether the Clubs own a copyright in the telecasts of major league baseball games. In general, copyright in a work "vests initially in the author or authors of the work," 17 U.S.C. § 201(a); however, "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author ... and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).[3] A work made for hire is defined in pertinent part as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101.[4] Thus, an employer owns a copyright in a work if (1) the work satisfies the generally applicable requirements for copyrightability set forth in 17 U.S.C. § 102(a), (2) the work was prepared by an employee, (3) the work was prepared within the scope of the employee's employment, and (4) the parties have not expressly agreed otherwise in a signed, written instrument.

**2.** Although the Players generally claim "property rights" in their performances, they specifically assert only the right of publicity. Hence, we shall consider the Players' mention of property rights to refer only to their right of publicity.

**3.** The parties do not dispute that the Clubs' copyright claim is governed by the provisions of the Copyright Act of 1976, rather than the 1909 enactment. Because the Clubs did not seek a declaration of their rights in any works created before January 1, 1978, the effective date of the 1976 Act, we need not consider the provisions of

the 1909 Act, or address whether the 1976 Act applies retroactively. *Cf. Roth v. Pritikin,* 710 F.2d 934, 939 (2d Cir.1983) (1976 Act's codification of the "work made for hire" doctrine does not apply retroactively).

**4.** This case does not call upon us to address the separate provisions for certain specially commissioned works that are set forth in the definition of a "work made for hire" at 17 U.S.C. § 101.

### a. *Copyrightability of the telecasts*

The district court concluded that the telecasts were copyrightable works. We agree. Section 102 sets forth three conditions for copyrightability: first, a work must be fixed in tangible form; second, the work must be an original work of authorship; and third, it must come within the subject matter of copyright.[5] *See* 17 U.S.C. § 102(a). Although there may have been some question at one time as to whether simultaneously recorded live broadcasts were copyrightable, this is no longer the case. Section 101 expressly provides that "[a] work consisting of sounds, images, or both, that are being transmitted, is 'fixed' ... if a fixation of the work is being made simultaneously with its transmission." Since the telecasts of the games are videotaped at the same time that they are broadcast, the telecasts are fixed in tangible form. *See National Football League v. McBee & Bruno's, Inc.*, 792 F.2d 726, 731–32 (8th Cir.1986); *see also* H.R. Rep. No. 1476, 94th Cong., 2d Sess. 52 ("House Report"), *reprinted in* 1976 U.S. Code Cong. & Ad.News 5659, 5665.

Moreover, the telecasts are original works of authorship. The requirement of originality actually subsumes two separate conditions, *i.e.*, the work must possess an independent origin and a minimal amount of creativity.[6] *See, e.g., L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir.) (en banc), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976); *Withol v. Wells*, 231 F.2d 550, 553 (7th Cir.1956); *see also* M. Nimmer, *Nimmer on Copyright* § 2.01 (1985) ("Nimmer"). It is obvious that the telecasts are independent creations, rather than reproductions of earlier works.

As for the telecasts' creativity, courts long have recognized that photographing a person or filming an event involves creative labor. *See, e.g., Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60, 4 S.Ct. 279, 282, 28 L.Ed. 349 (1884). For example, one court held that the Zapruder film of the Kennedy assassination was copyrightable because it embodied

> many elements of creativity. Among other things, Zapruder selected the kind of camera (movies, not snapshots), the kind of film (color), the kind of lens (telephoto), the area in which the pictures were to be taken, the time they were to be taken, and (after testing several sites) the spot on which the camera would be operated.

*Time Inc. v. Bernard Geis Associates*, 293 F.Supp. 130, 143 (S.D.N.Y.1968). The many decisions that must be made during the broadcast of a baseball game concerning camera angles, types of shots, the use of instant replays and split screens, and shot selection similarly supply the creativity required for the copyrightability of the telecasts. *See* House Report at 52, *reprinted in* 1976 U.S.Code Cong. & Ad. News at 5665 ("When a football game is being covered by four television cameras, with a director guiding the activities of the

---

5. "The two fundamental criteria of copyright protection [are] ... originality and fixation in tangible form." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 51, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5664. These requirements have been derived from the Constitution's limited grant of authority to the Congress "[t]o promote the ... useful Arts, by securing for limited times to Authors ... the exclusive Right to their ... Writings." U.S. Const. art. I, § 8, cl. 8; *see* M. Nimmer, *Nimmer on Copyright* §§ 1.06[A], 1.08[A]–[C] (1985).

6. It is important to distinguish among three separate concepts—originality, creativity, and novelty. A work is original if it is the independent creation of its author. A work is creative if it embodies some modest amount of intellec-

tual labor. A work is novel if it differs from existing works in some relevant respect. For a work to be copyrightable, it must be original and creative, but need not be novel. (Thus, in contrast to patent law, a work that is independently produced by two separate authors may be copyrighted by both.) *See generally* Nimmer, §§ 1.06[A], 1.08[C][1], 2.01[A]–[B]. Although the requirements of independent creation and intellectual labor both flow from the constitutional prerequisite of authorship and the statutory reference to original works of authorship, courts often engender confusion by referring to both concepts by the term "originality." For the sake of clarity, we shall use "originality" to mean independent authorship and "creativity" to denote intellectual labor.

four cameramen and choosing which of their electronic images are sent to the public and in which order, there is little doubt that what the cameramen and the director are doing constitutes 'authorship.' ").[7]

Furthermore, the telecasts are audiovisual works, which under § 102 [8] come within the subject matter of copyright. *See* 17 U.S.C. § 101 (definition of "[a]udiovisual works")[9]; *see also WGN Continental Broadcasting Co. v. United Video, Inc.*, 693 F.2d 622, 627–28 (7th Cir.1982) (teletext included in news broadcasts is a copyrightable audiovisual work); *cf. Midway Manufacturing Co. v. Artic International, Inc.*, 704 F.2d 1009, 1012 (7th Cir.) (video games are copyrightable audiovisual works), *cert. denied*, 464 U.S. 823, 104 S.Ct. 90, 78

L.Ed.2d 98 (1983). The telecasts are, therefore, copyrightable works.

### b. *Employer-employee relationship*

With regard to the relationship between the Clubs and the Players, the district court found, and the Players do not dispute, that the Players are employees of their respective Clubs. We add only that this finding is consistent with the broad construction given to the term "employee" by courts applying the "work made for hire" doctrine. *See Evans Newton Inc. v. Chicago Systems Software*, 793 F.2d 889, 894 (7th Cir.1986) (a person acting under another's direction and supervision is an employee for the purpose of the work made for hire doctrine); *Aldon Accessories v.*

---

**7.** The Players argue that their performances are not copyrightable works because they lack sufficient artistic merit. We disagree. Only a modicum of creativity is required for a work to be copyrightable.

*See L. Batlin & Son*, 536 F.2d at 486; *Gilles-Widmer Co. v. Milton Bradley Co.*, 313 F.2d 143, 146 (7th Cir.), *cert. denied*, 373 U.S. 913, 83 S.Ct. 1303, 10 L.Ed.2d 414 (1963); *Withol*, 231 F.2d at 553; *Alfred Bell & Co. v. Catalda*, 191 F.2d 99, 102 (2d Cir.1951) (Frank, J.). *See generally* Nimmer, §§ 1.08[C][1], 2.01[B], 2.08[B][1]. Contrary to the Players' contentions, aesthetic merit is not necessary for copyrightability. *See* House Report at 51, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 5664. A recording of a performance generally includes creative contributions by both the director and other individuals responsible for recording the performance and by the performers whose performance is captured. *See* House Report at 56, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 5669 (referring to sound recordings). Judged by the above standard, the Players' performances possess the modest creativity required for copyrightability. As Justice Holmes once declared, "if ... [certain works] command the interest of any public, they have a commercial value—it would be bold to say that they have not an aesthetic and educational value—and the taste of any public is not to be treated with contempt." *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 252, 23 S.Ct. 298, 801, 47 L.Ed. 460 (1903) (holding circus poster copyrightable). Courts thus should not gainsay the copyrightability of a work possessing great commercial value simply because the work's aesthetic or educational value is not readily apparent to a person trained in the law. That the Players' performances possess great commercial value indicates that the works embody the modicum of creativity required for copyrightability.

Moreover, even if the Players' performances were not sufficiently creative, the Players agree that the cameramen and director contribute creative labor to the telecasts. The work that is the subject of copyright is not merely the Players' *performances*, but rather the *telecast* of the Players' performances. The creative contribution of the cameramen and director alone suffices for the telecasts to be copyrightable.

**8.** Section 102(a) provides:

Copyright protection subsists ... in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other *audiovisual works;* and

(7) sound recordings.

17 U.S.C. § 102(a) (emphasis added).

**9.** "Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

17 U.S.C. § 101.

*Spiegel, Inc.*, 738 F.2d 548, 551–53 (2d Cir.) (same), *cert. denied*, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984).

### c. *Scope of employment*

■ The district court further found that the scope of the Players' employment encompassed the performance of major league baseball before "live and remote audiences." *See Baltimore Orioles*, 1985 Copyright L.Dec. at 19,731. On appeal the Players argue that there exist genuine issues of material fact as to whether the performance of baseball for televised audiences is within the scope of the Players' employment. Nevertheless, the Players failed to raise this contention in timely fashion. In their briefs and argument before the district court, the Players asserted several reasons that telecasts of major league baseball games might not be works made for hire. *See* Players' Memorandum in Opposition to the Owners' Motion for Summary Judgment and in Support of the Players' Cross-Motion for Summary Judgment on the Copyright Claim 101–18 ("Players' Summary Judgment Memorandum"); Transcript of Summary Judgment Hearing 40–43. However, they never claimed that the performance of baseball before televised audiences was not within the scope of their employment. Indeed, the only issue as to which Players argued that there was a genuine issue of material fact concerned the parties' written agreements respecting ownership of the telecasts' copyright. *See* Players' Summary Judgment Memorandum 118. It is axiomatic that an argument of this kind is waived if it is not brought before the district court. *See, e.g., Libertyville Datsun Sales, Inc. v. Nissan Motor Corp.*, 776 F.2d 735, 737 (7th Cir. 1985) (citing cases); *Hershinow v. Bonamarte*, 735 F.2d 264, 266 (7th Cir.1984). The Players, therefore, failed to preserve this argument.

Moreover, even on appeal, the Players do not identify any evidence that would create a genuine issue of material fact as to the scope of the Players' employment. In contrast to the Players' perfunctory claim that playing baseball for television audiences is not within the scope of their employment, *see* Appellant's Brief 29, the Clubs brought forth detailed evidence in support of their motion for summary judgment that the scope of the Players' employment encompassed performances before broadcast audiences. *See* Memorandum of Law in Support of the Major League Baseball Clubs' Motion for Summary Judgment 6, 9–10.[10] Because of the Players' failure to point to any evidence to the contrary, we would not reverse the district court's finding that the performance of baseball before remote audiences is within the Players' scope of employment even if the Players had preserved their contention. *See, e.g., Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (a party who opposes summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").

### d. *Written agreements*

■ Because the Players are employees and their performances before broadcast audiences are within the scope of their employment, the telecasts of major league baseball games, which consist of the Players' performances, are works made for hire within the meaning of § 201(b). *See* Nimmer, § 5.03[D] (the parties can change the statutory presumption concerning the ownership of a copyright in a work made for hire, but cannot vary the work's status as a work made for hire). Thus, in the absence of an agreement to the contrary, the Clubs are presumed to own all of the rights encompassed in the telecasts of the games. The district court found that there was no written agreement that the Clubs would not own the copyright to the telecasts, and, therefore, that the copyright was owned by the Clubs. As noted above, the Players argued before the district court and on

---

**10.** For example, the Clubs adduced evidence that the Players are acutely aware of the fact that major league baseball games are televised, and that the Players understand that television revenues have a bearing on the level of the salaries that they receive.

appeal that genuine issues of material fact concerning the parties' agreements as to ownership of the copyright precluded resolution of this issue before a trial on the merits.

The provisions of the three written agreements on which the Players rely to establish a genuine issue of material fact are paragraph 3(c) of the Uniform Player's Contract, paragraph 7 of the Benefit Plan, and article X of the Basic Agreement. First, the Uniform Player's Contract is the standard form contract between individual players and their respective clubs. In 1947, the first year that the Clubs sold network television rights to major league baseball games, the following language was added to the contract:

> The Player agrees that his picture may be taken for still photographs, motion pictures or television at such times as the Club may designate and that all rights in such pictures shall belong to the Club and may be used by the Club for publicity purposes in any manner it desires.

Uniform Player's Contract ¶ 3(c). The language of paragraph 3(c) has remained materially unchanged over the years.

Second, the Benefit Plan sets forth the particulars of the Players' pension fund. First entered into in 1967, the Benefit Plan arose in large part out of the parties' long-standing dispute as to the allocation of national television revenues to the pension fund. In negotiations over the 1969 Benefit Plan, the Players asserted their long-held claim that broadcasts of baseball games without their consent violated their rights of publicity in their performances. The Clubs, however, maintained that the Players had no rights whatsoever in the telecasts. The parties accordingly agreed to the following compromise provision:

> The execution of this Agreement shall not be deemed to change any rights or obligations of the Clubs or the players with respect to the funding of the Plan (except to the extent set forth in other Paragraphs of this Agreement) or with respect to radio and television, as such rights and obligations existed immediate-

ly after the execution of the Agreement Re Major League Baseball Players Benefit Plan of January 1, 1967.

1969 Benefit Plan ¶ 7. Identical provisions have been incorporated in every Benefit Plan negotiated since 1969.

Third, the Basic Agreement represents the collective bargaining agreement between the Players and the Clubs. The original Basic Agreement entered into in 1968 provided that grievances would be arbitrated by the Commissioner of Baseball. When the parties entered into the 1970 Basic Agreement, they agreed to arbitration of grievances by a tripartite panel, rather than by the Commissioner; however, the Clubs did not agree to submit to impartial arbitration those disputes concerning the right to broadcast major league baseball games. The parties thus agreed that:

> Anything in the Grievance Procedure provided for in the Basic Agreement to the contrary notwithstanding, complaints or disputes as to any rights of the Players or the Clubs with respect to the sale or proceeds of sale of radio or television broadcasting rights in any baseball games by any kind or method of transmission, dissemination or reception shall not be subject to said Grievance Procedure. However, nothing herein or in the Grievance Procedure shall alter or abridge the rights of the parties, or any of them, to resort to a court of law for the resolution of such complaint or dispute.

1970 Basic Agreement art. X. This language has been included verbatim in each Basic Agreement entered into since 1970.

The Players contend that these three provisions create a genuine issue of material fact with respect to the parties' agreements concerning the ownership of the copyright to the telecasts. We disagree. Section 201(b) states that the employer owns the copyright in a work made for hire "unless the parties have expressly agreed otherwise in a written instrument signed by them." The requirement that an agreement altering the presumption that an em-

ployer owns the copyright in a work made for hire represents a substantial change in the "work made for hire" doctrine. Under prior law, "such an agreement could be either *oral* or *implied*." Nimmer, § 5.03[D] (emphasis added); *see also May v. Morganelli-Heumann & Associates,* 618 F.2d 1363, 1369 (9th Cir.1980) (alleged custom that architect retains the copyright in his drawings unless the parties otherwise agree raises material issue of fact). However, § 201(b) requires that an agreement altering the statutory presumption be both *written* and *express.* In essence, this provision is a statute of frauds. *See Roth v. Pritikin,* 787 F.2d 54, 56 (2d Cir.1986) (discussing parallel provision for specially commissioned works in 17 U.S.C. § 101).

▋ In this case, the parties have not expressly agreed to rebut the statutory presumption that the Clubs own the copyright in the telecasts. Paragraph 3(c) of the Uniform Player's Contract does not declare that the copyright in the telecasts is owned by the Players, rather than by the Clubs. Instead, it merely grants the Clubs the rights to take the Players' pictures for still photographs, motion pictures, and television and to use the pictures for publicity purposes. A limitation on the Clubs' rights to televise the Players' performances perhaps might be implied by the grant of these particular rights;[11] however, even if such an implied limitation were plausible, paragraph 3(c) nowhere contains an express statement that the Clubs do not own the

copyright in the telecasts of the Players' performances.

Paragraph 7 of the Benefit Plan and Article X of the Basic Agreement similarly do not declare that the Players, rather than the Clubs, own the copyright in the telecasts. The two provisions simply preserved whatever rights in the telecasts that the parties might possess and reserved each party's right to have disputes concerning television rights be resolved in court, rather than by arbitration. They nowhere state that either the Clubs or the Players own the copyright in the telecasts.[12] These provisions thus do not represent an express agreement that the Players own the copyright in the telecasts. If anything, they reflect the parties' express disagreement as to the copyright's ownership.

▋ The Players also argue that these three provisions must be read in light of the agreements' collective bargaining history, and that the circumstances surrounding the agreements cannot be determined without a trial.[13] We disagree. Under § 201(b), an agreement altering the statutory presumption that the employer owns the copyright in a work made for hire must be express. This is to say, the parties' agreement must appear on the face of the signed written instrument. Section 201(b) thus bars the use of parol evidence to imply a provision not found within the four corners of the parties' agreement.[14] *Cf. Ar-*

---

11. The Players rely on the common law maxim of construction *expressio unius est exclusio alterius,* under which the expression of one right implies the exclusion of another right that is not expressed. This maxim is, however, inapplicable to ascertaining whether the parties have *expressly* agreed in a signed, written instrument that the Players own the copyright in the telecasts of the games.

12. The Players point to the absence of a provision expressly granting the Clubs the right to televise the games as support for their assertion that they have "reserved" their rights of publicity in their performances. Nonetheless, there is no need for such an express declaration because under § 201(b) the Clubs are presumed to own the copyright in the works produced by their employees unless the parties expressly agree otherwise in a signed, written instrument.

13. The Players rely on labor law cases concerning the construction of collective bargaining agreements. Such cases, however, have no bearing on the consideration in a copyright case of the parties' agreements concerning the ownership of the copyright in a work made for hire.

14. Congress considered incorporating in § 201(b) the "shop right" doctrine of patent law under which the employer would acquire the right to use the employee's work to the extent needed for the purposes of the employer's regular business, but the employee would retain all other rights so long as he or she refrained from authorizing competing uses. Congress rejected this change because it would create uncertainty as to the ownership of the copyright in a work made for hire. *See* House Report at 121, *reprinted in* 1976 U.S. Code Cong. & Ad. News at

*thur Retlaw & Associates v. Travenol Laboratories, Inc.*, 582 F.Supp. 1010, 1014 (N.D.Ill.1984) (letter signed by only one party does not constitute a signed, written instrument under § 201(b)). Moreover, even if extrinsic evidence were admissible to explain an ambiguity in the parties' agreement, the provisions relied upon by the Players are unambiguous with respect to the ownership of the copyright in the telecasts. Since the contractual terms regarding television rights are clear, it is unnecessary to examine the parties' collective bargaining history to ascertain the meaning of the agreements.[15]

The Players further assert that the parties' traditional practice of devoting approximately one-third of the revenues derived from nationally televised broadcasts to the Players' pension fund establishes a genuine issue of material fact as to the ownership of the copyright in these telecasts.[16] We disagree. The allocation of revenues from nationally televised broadcasts is determined by the parties' relative bargaining strength and ability. Depending on the Players' bargaining power, they can negotiate a greater or a lesser share of the national telecast revenues.[17] Neverthe-

less, there is no relationship between the division of *revenues* from nationally televised broadcasts and the ownership of *rights* in those telecasts. For example, a motion picture star might negotiate to receive a certain number of "points" from a film's profits; however, that she shares in the film's profits does not mean that she owns some share of the copyright in the film. (Indeed, the producer most likely holds the copyright in the work.) Just as the ownership of points in a film's profits does not represent a proportionate ownership of the copyright in the film, the Players' receipt in the form of pension contributions of a certain fraction of the revenues from nationally televised broadcasts in no way suggests that they own any part of the copyright in the telecasts.

We thus conclude that there are no genuine issues of material fact as to the ownership of the copyright in the telecasts, and that the parties did not expressly agree to rebut the statutory presumption that the employer owns the copyright in a work made for hire. We, therefore, hold that the Clubs own the copyright in telecasts of major league baseball games.[18]

5737. To allow parol evidence to supply a contractual term that does not expressly appear on the face of the written instrument similarly would engender uncertainty as to the ownership of the copyright and would frustrate the purpose underlying § 301(a)'s "statute of frauds" provision.

15. In any event, the collective bargaining history behind the parties' agreements similarly reflects a sharp dispute as to the ownership of the television rights to the games. *A fortiori*, it cannot establish that the parties agreed that the Players would own the copyright in the televised broadcasts.

16. The Players do not claim that they traditionally have received some share of the revenues from locally televised broadcasts. Therefore, even under the Players' analysis, the division of revenues from *national broadcasts* does not create a genuine issue of material fact as to the ownership of the copyright in *local telecasts.* Moreover, the Clubs contest the assertion that they traditionally have devoted to the Players' pension fund approximately one-third of the revenues from nationally televised broadcasts. They argue that since it was first entered into in 1967, the Benefit Plan simply has provided for

the Clubs to contribute to the pension plan a flat dollar amount from whatever source of revenue they choose, and never has required the Clubs to contribute any amount, let alone one-third, of the national telecast revenues. Nonetheless, as our subsequent discussion indicates, we need not resolve this dispute because it is not material to the ownership of the copyright in the national telecasts.

17. *Cf.* Quinn & Warren, *Professional Team Sports New Legal Arena: Television and the Player's Right of Publicity,* 16 Ind.L.Rev. 487, 510 n. 102 (1983) (baseball players' limited share in the revenues from televised broadcasts "appears to have been derived from the general give-and-take of the collective bargaining process, rather than from right of publicity considerations").

18. We have not been called upon to decide whether the copyrights in the telecasts of the various games are owned separately by individual clubs or jointly by some combination of clubs. We also have not been asked to determine whether the copyrights in the telecasts are owned exclusively by the Clubs or jointly by the Clubs and the television stations or networks

## 2. *Preemption under 17 U.S.C. § 301(a)*

Although the Clubs own the copyright to the telecasts of major league baseball games, the Players claim that broadcasts of these games made without their express consent violate their rights to publicity in their performances. For the reasons stated below, we hold that the Clubs' copyright in the telecasts of major league baseball games preempts the Players' rights of publicity in their game-time performances.

> Section 301(a) of Title 17 provides that all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103,[19] whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).[20] This provision sets forth two conditions that both must be satisfied for preemption of a right under state law: First, the work in which the right is asserted must be fixed in tangible form and come within the subject matter of copyright as specified in § 102. Second, the right must be equivalent to any of the rights specified in § 106. *See Donald Frederick Evans & Associates, Inc. v. Continental Homes, Inc.,* 785 F.2d 897, 913–14 (11th Cir.1986); *Ehat v. Tanner,* 780 F.2d 876, 878 (10th Cir.1985); *Harper & Row Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 199–200 (2d Cir.1983), *rev'd on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *see also* Nimmer, § 1.01[B].

### a. *Section 102 test*

The works in which the Players claim rights are the telecasts of major league baseball games. As established above, the telecasts are fixed in tangible form because they are recorded simultaneously with their transmission and are audiovisual works which come within the subject matter of copyright. The first condition for preemption is, therefore, satisfied.

■■■ The Players argue, however, that the works in which they claim rights are their performances, rather than the telecasts of the games in which they play, and that performances *per se* are not fixed in tangible form.[21] They contend that, since

---

that record and broadcast the games. We express no opinion on these issues.

**19.** 17 U.S.C. § 103, which provides that the subject matter of copyright includes compilations and derivative works, is not pertinent to this appeal.

**20.** Section 301(a) has been termed "the most fundamental change in the copyright system 'since its inception.'" Shipley, *Publicity Never Dies; It Just Fades Away: The Right of Publicity and Federal Preemption,* 66 Cornell L.Rev. 673, 701 (1981) (quoting U.S. Copyright Office, *General Guide to the Copyright Act of 1976* 2:1 (1977)). Before the Copyright Act of 1976 became effective, there had been a dual system of federal statutory and state common-law copyright protection in effect in the United States since the first copyright statute in 1790. *See* House Report at 129, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 5745. Under that system, federal copyright protection was available only for published works. *See* Nimmer, §§ 4.01–.02. In addition to federal copyright protection, common-law copyrights were available under state

law for unpublished works, *see Wheaton v. Peters,* 33 U.S. (8 Peters) 591, 657, 8 L.Ed. 1055 (1834), and for published works that were not afforded federal copyright protection, *see Goldstein v. California,* 412 U.S. 546, 569, 93 S.Ct. 2303, 2316, 37 L.Ed.2d 163 (1973). The 1976 Act dramatically altered this dual system of copyright protection in two ways. First, as discussed above, § 102(a) extended federal copyright protection to all works fixed in any tangible medium of expression, including simultaneously recorded "live" works, whether they are published or unpublished. More importantly, however, § 301 expressly preempted rights under state law that are equivalent to any of the bundle of rights encompassed by a federal copyright.

**21.** To support their argument that their performances cannot be copyrighted, the Players refer to the "Sound Recording Performance Rights Amendment," S. 1552 and H.R. 997, 96th Cong., 1st Sess. (1979), an unsuccessful attempt to amend the Copyright Act to grant certain performance rights to sound recording artists.

the works in which they assert rights are not fixed in tangible form, their rights of publicity in their performances are not subject to preemption. We disagree. Under § 101, "[a] work is 'fixed' in a tangible medium of expression when its embodiment in a copy ..., by or·under the authority of the author, is sufficiently permanent and stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." The Players' performances are embodied in a copy, *viz*, the videotape of the telecast, from which the performances can be perceived, reproduced, and otherwise communicated indefinitely. Hence, their performances are fixed in tangible form, and any property rights in the performances that are equivalent to any of the rights encompassed in a copyright are preempted.

It is, of course, true that unrecorded performances *per se* are not fixed in tangible form. Among the many such works not fixed in tangible form are "choreography that has never been filmed or notated, an extemporaneous speech, 'original works of authorship' communicated solely through conversations or live broadcasts, and a dramatic sketch or musical composition improvised or developed from memory and without being recorded or written down." House Report at 131, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 5747. Because such works are not fixed in tangible form, rights in such works are not

subject to preemption under § 301(a). Indeed, § 301(b), which represents the obverse of § 301(a), expressly allows the states to confer common law copyright protection upon such works, *id.; see also* Nimmer §§ 1.08[C], 2.03[B], and protection has been afforded to unfixed works by some states. *See, e.g.,* Cal.Civil Code § 980 (West 1982 & 1986 Supp.) (protecting "any original work of authorship that is not fixed in any tangible medium of expression"); *cf. Estate of Hemingway v. Random House, Inc.,* 23 N.Y.2d 341, 244 N.E.2d 250, 296 N.Y.S.2d 771 (1968) (common law copyright might be recognized in contents of an unrecorded conversation). Nonetheless, once a performance is reduced to tangible form, there is no distinction between the performance and the recording of the performance for the purpose of preemption under § 301(a). Thus, if a baseball game were not broadcast or were telecast without being recorded, the Players' performances similarly would not be fixed in tangible form and their rights of publicity would not be subject to preemption. *See* Nimmer, § 1.08[C] (using the example of a live broadcast of a baseball game). By virtue of being videotaped, however, the Players' performances are fixed in tangible form, and any rights of publicity in their performances that are equivalent to the rights contained in the copyright of the telecast are preempted.[22]

---

Nevertheless, that a Congress, for a reason that we cannot discern, has not enacted an amendment has little or no bearing on the construction of a statute enacted by an earlier Congress. *Cf. Benson v. Allphin,* 786 F.2d 268, 275 n. 15 (7th Cir.1986) (discussing difficulty of construing congressional acquiescence in judicial decisions). In this case, the failure to enact the "Sound Recording Performance Rights Amendment" does not establish that the contributions of recording artists (and, by analogy, the performances of the Players) cannot presently be copyrighted. If anything, it suggests merely that recording artists are not entitled to royalties from the compulsory licensing of sound recordings.

**22.** An example illustrates this point. Take the case of *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), in which Hugo Zacchini sued a tele-

vision station for violating his right of publicity by broadcasting the entirety of his human cannonball act. *Zacchini* was decided before § 301(a) became effective, but let us suppose that the same case arises again today. Assuming that Zacchini did not videotape or otherwise record his performance, his human cannonball act would not be fixed in tangible form and could not be copyrighted. Nonetheless, because the work in which he asserts rights would not be fixed in a tangible medium of expression, his right of publicity in his performance would not be subject to preemption. Thus, if a television station were to broadcast his act, he still could sue successfully for violation of his right of publicity in his performance. Merely that the television station might videotape its telecast would not grant the station a copyright in the broadcast of Zacchini's performance or preempt Zacchini's right of publicity. To be "fixed" in tangible form, a work must be recorded "by or

The Players also contend that to be a "work[ ] of authorship that ... [is] fixed in a tangible medium of expression" within the scope of § 301(a), a work must be copyrightable. They assert that the works in which they claim rights, namely their performances, are not copyrightable because they lack sufficient creativity. They consequently conclude that because the works in which they claim rights are not works within the meaning of § 301(a), their rights of publicity are not subject to preemption. There is a short answer to this argument. Congress contemplated that "[a]s long as a work fits within one of the general subject matter categories of section 102 and 103, ... [section 301(a)] prevents the States from protecting it even if it fails to achieve Federal copyright because it is too minimal or lacking in originality to qualify." House Report at 131, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 5747.[23] Hence,

§ 301(a) preempts all equivalent state-law rights claimed in any work within the subject matter of copyright whether or not the work embodies any creativity. Regardless of the creativity of the Players' performances, the works in which they assert rights are copyrightable works which come within the scope of § 301(a) because of the creative contributions of the individuals responsible for recording the Players' performances. Therefore, the Players' rights of publicity in their performances are preempted if they are equivalent to any of the bundle of rights encompassed in a copyright.[24]

### b. *Section 106 test*

A right under state law is "equivalent" to one of the rights within the general scope of copyright if it is violated by the exercise of any of the rights set forth in § 106.[25] *See Allied Artists Pictures Corp.*

under the authority of the author," here Zacchini. *See* 17 U.S.C. § 101 (definition of "fixed"). Because Zacchini did not consent to the telecast, the broadcast could not be "fixed" for the purpose of copyrightability and Zacchini's right of publicity would not be subject to preemption.

Assume, however, that Zacchini, after the fashion of championship prize fights, transmitted his live act over closed-circuit television and simultaneously recorded it for later broadcast over a cable television network, and that the satellite signal for the closed-circuit show was intercepted and rebroadcast by a television station. Zacchini sues the station for violation of his copyright and his right to publicity. He would prevail on the copyright infringement claim only. *See McBee & Bruno's, Inc.*, 792 F.2d at 732; *WGN Continental Broadcasting Co.*, 693 F.2d at 624. Nevertheless, because his act was videotaped, the work in which he asserts rights would be fixed in tangible form and thus copyrightable. Assuming *arguendo* that a right of publicity is equivalent to one of the rights encompassed in a copyright—a subject that we soon shall take up—his right of publicity in his performance would be preempted. *See* Shipley, *Publicity Never Dies; It Just Fades Away: The Right of Publicity and Federal Preemption*, 66 Cornell L.Rev. 673, 710–11 (1981).

**23.** The reason that § 301(a) preempts rights claimed in works that lack sufficient creativity to be copyrightable is to prevent the states from granting protection to works which Congress has concluded should be in the public domain.

**24.** The Players' rights of publicity in their performances are preempted only if they would be

violated by the exercise of the Clubs' copyright in the telecasts. A player's right of publicity in his name or likeness would not be preempted if a company, without the consent of the player, used the player's name to advertise its product, *cf. Cepeda v. Swift & Co.*, 415 F.2d 1205, 1206 (8th Cir.1969), placed the player's photograph on a baseball trading card, *cf. Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 148–49 (3d Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982); *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir.), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953), or marketed a game based upon the player's career statistics, *cf. Uhlaender v. Henricksen*, 316 F.Supp. 1277, 1282 (D.Minn.1970).

**25.** From the time it was first proposed in 1963 as part of a general revision of copyright law until it reached the floor of the House of Representatives in 1976, the language that became § 301 contained a list of causes of action that were not "equivalent" to a copyright. That list originally consisted of breaches of trust, invasion of privacy, and deceptive trade practices including passing off and false representations, but later came to include such actions as misappropriation, breaches of contract, trespass, conversion, and defamation. Nevertheless, in response to objections by the Department of Justice, *see* Copyright L.Rep. (CCH) ¶ 7305 (setting forth complete text of letters), this provision was deleted in a last-minute amendment on the House floor. Because the House's debate concerning the effect of the amendment is ambigu-

*v. Rhodes,* 679 F.2d 656, 662–63 (6th Cir. 1982), *aff'g in pertinent part,* 496 F.Supp. 408, 443–44 (S.D.Ohio 1980) (right is equivalent if it creates or destroys right contained in copyright). That section grants the owner of a copyright the exclusive rights to reproduce (whether in original or derivative form), distribute, perform, and display the copyrighted work. *See* 17 U.S.C. § 106; *see also* Nimmer, § 1.01[B][1]. Thus, a right is equivalent to one of the rights comprised by a copyright if it "is infringed by the mere act of reproduction, performance, distribution or display." *Id.; see also Donald Frederick Evans & Associates, Inc.,* 785 F.2d at 914; *Ehat v. Turner,* 780 F.2d at 878; *Harper & Row Publishers, Inc.,* 723 F.2d at 200.

■ In particular, the right to "perform" an audiovisual work means the right "to show its images in any sequence or to make the sounds accompanying it audible." 17 U.S.C. § 101 (definition of "perform"). Thus, the right to perform an audiovisual work encompasses the right to broadcast it. *See* House Report at 63, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 5676–77 ("[A] broadcasting system is performing when it transmits ... [a] performance ...; a local broadcaster is performing when it transmits the network broadcast; a cable television system is performing when it retransmits the broadcast to its subscribers....."); *see also* Nimmer, § 8.14[B]. Hence, a right in a work that is conferred by state law is equivalent to the right to perform a telecast of that work if the state-law right is infringed merely by broadcasting the work.

■ In this case, the Players claim a right of publicity in their performances. As a number of courts have held, a right of publicity in a performance is violated by a televised broadcast of the performance. *See Ettore v. Philco Television Broadcasting Corp.,* 229 F.2d 481 (3d Cir.), *cert. denied,* 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956) (broadcast of boxing match); *Sharkey v. National Broadcasting Co.,* 93 F.Supp. 986 (S.D.N.Y.1950) (same); *Lombardo v. Doyle, Dane & Bernbach, Inc.,* 58 A.D.2d 620, 396 N.Y.S.2d 661 (1977) (broadcast of commercial depicting bandleader's performance); *Zacchini v. Scripps-Howard Broadcasting Co.,* 54 Ohio St.2d 286, 376 N.E.2d 582 (1978), *on remand from* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (broadcast of human cannonball act). Indeed, from the start of this litigation, the Players consistently have maintained that their rights of publicity permit them to control telecasts of their performances, and that televised broadcasts of their performances made without their consent violate their rights of publicity in their performances. *See, e.g., Rogers* Complaint ¶ 15, 30, 40; *Baltimore Orioles* Answer ¶ 43; Players' Summary Judgment Memorandum 14–19; Transcript of Summary Judgment Hearing 40; Appellant's Brief 3. Because the exercise of the Clubs' right to broadcast telecasts of the games infringes the Players' rights of publicity in their performances, the Players' rights of publicity are equivalent to at least one of the rights encompassed by copyright, *viz.,* the right to perform an audiovisual work. Since the works in which the Players claim rights are fixed in tangible form and come within the subject matter of copyright, the Players' rights of publicity in their performances are preempted.

The Players argue that their rights of publicity in their performances are not equivalent to the rights contained in a copyright because rights of publicity and copyrights serve different interests.[26] In

ous, if not contradictory, and because the Senate concurred without discussion in the House's version of § 301, almost any interpretation of the concept of equivalent rights can be inferred from the legislative history. Therefore, in determining whether a particular right is equivalent to a copyright, we place little weight on the deletion of the list of nonequivalent rights. For an excellent discussion of the legislative history

of § 301, *see* Abrams, *Copyright, Misappropriation, and Preemption: Constitutional and Statutory Limits of State Law Protection,* 1983 Sup.Ct. Rev. 509, 537–48. *See also* Nimmer, § 1.01[B][1].

**26.** The Players cite to four opinions to support their assertion that § 301(a) does not preempt the right of publicity. *See Factors Etc., Inc. v.*

their view, the purpose of federal copyright law is to secure a benefit to the public, but the purpose of state statutory or common law concerning rights of publicity is to protect individual pecuniary interests. We disagree.

The purpose of federal copyright protection is to benefit the public by encouraging works in which it is interested. To induce individuals to undertake the personal sacrifices necessary to create such works, federal copyright law extends to the authors of such works a limited monopoly to reap the rewards of their endeavors. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984); *Twentieth Cen-*

*tury Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975); *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954); *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127, 52 S.Ct. 546, 546, 76 L.Ed. 1010 (1932). Contrary to the Players' contention, the interest underlying the recognition of the right of publicity also is the promotion of performances that appeal to the public. The reason that state law protects individual pecuniary interests is to provide an incentive to performers to invest the time and resources required to develop such performances. In *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), the prin-

*Pro Arts, Inc.*, 652 F.2d 278, 289 (2d Cir.1981) (Mansfield, J., dissenting), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1937, 72 L.Ed.2d 422 (1982); *Bi-Rite Enterprises, Inc. v. Button Master*, 555 F.Supp. 1188, 1201 (S.D.N.Y.1983); *Apigram Publishing Co. v. Factors Etc., Inc.*, No. C 78–525, slip op. (N.D.Ohio July 30, 1980) (available on LEXIS); *Lugosi v. Universal Pictures*, 25 Cal.3d 813, 850, 603 P.2d 425, 448, 160 Cal.Rptr. 323, 346 (1979) (Bird, C.J., dissenting). Each opinion is premised upon an erroneous analysis of preemption. The *Factors* dissent, the *Bi-Rite* court, and the *Lugosi* dissent assert without discussion that the right of publicity is not preempted because the work that it protects—a public figure's persona—cannot be fixed in a tangible medium of expression. We disagree. Because a performance is fixed in tangible form when it is recorded, a right of publicity in a performance that has been reduced to tangible form is subject to preemption.

The *Apigram* court stated without extended discussion or citation to authority that the right of publicity is not preempted because it requires additional elements other than the reproduction, performance, distribution or display of a copyrighted work. We disagree. Congress intended that "[t]he evolving common law rights of "privacy," "publicity," and trade secrets and the general law of defamation and fraud, would remain unaffected [by § 301(a) ] so long as the causes of action contain *elements* such as an invasion of privacy or a breach of trust or confidentiality, that are *different in kind from copyright infringement.*" House Report at 132, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 5748 (emphasis added). Thus, a right is equivalent to a copyright if (1) it is infringed by the mere act of reproduction, performance, distribution, or display, or (2) it requires additional elements to make out a cause of action, but the additional elements do not differ in kind from

those necessary for copyright infringement. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 201 (2d Cir.1983), *aff'g in pertinent part*, 501 F.Supp. 848, 852 (S.D.N.Y.1980), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *cf. Crow v. Wainwright*, 720 F.2d 1224, 1226 (11th Cir.1983) (publication with scienter not qualitatively different), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 35 (1984); *Mayer v. Josiah Wedgewood & Sons, Ltd.*, 601 F.Supp. 1523, 1535 (S.D.N.Y.1985) (reproduction with intent, knowledge, or commercial immorality not different in kind) (discussing cases); *Rand McNally & Co. v. Fleet Management Systems, Inc.*, 591 F.Supp. 726, 739 (N.D.Ill.1983) (publication with commercial immorality not qualitatively different). Contrary to the belief of the *Apigram* court, the right of publicity does not require an invasion of personal privacy to make out a cause of action. It is true that the rights of publicity and of privacy evolved from similar origins; however, whereas the right of privacy protects against intrusions on seclusion, public disclosure of private facts, and casting an individual in a false light in the public eye, the right of publicity protects against the unauthorized exploitation of names, likenesses, personalities, and performances that have acquired value for the very reason that they are known to the public. *See, e.g., Zacchini*, 433 U.S. at 575–79, 97 S.Ct. at 2857–58; *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 832–33, 836 (6th Cir.1983); *Ali v. Playgirl, Inc.*, 447 F.Supp. 723, 728–29 (S.D.N.Y.1978); *Uhlaender v. Henricksen*, 316 F.Supp. 1277, 1279–82 (D.Minn. 1970); *Lombardo*, 58 A.D.2d at 621, 396 N.Y. S.2d at 664. Because the right of publicity does not require a qualitatively different additional element, it is equivalent to a copyright and is preempted to the extent that it is claimed in a tangible work within the subject matter of copyright.

cipal case on which the Players rely for their assertion that different interests underlie copyright and the right to publicity,[27] the Supreme Court recognized that the interest behind federal copyright protection is the advancement of the public welfare through the encouragement of individual effort by personal gain, *id.* at 576, 97 S.Ct. at 2857, and that a state's interest in affording a cause of action for violation of the right to publicity "is closely analogous to the goals of patent and copyright law." *Id.* at 573, 97 S.Ct. at 2856; *see also* Felcher & Rubin, *The Descendibility of the Right of Publicity: Is There Commercial Life After Death?*, 89 Yale L.J. 1125, 1129–32 (1980); Nimmer, *The Right of Publicity*, 19 Law & Contemp.Probs. 203, 215–16 (1954); Quinn & Warren, *Professional Team Sports New Legal Arena: Television and the Player's Right of Publicity*, 16 Ind.L.Rev. 487, 495 n. 45, 498 n. 59 (1983); Shipley, *Publicity Never Dies; It Just Fades Away: The Right of Publicity and Federal Preemption*, 66 Cornell L.Rev. 673, 681–84 (1981); Note, *State "Copyright" Protection for Performers: The First Amendment Question*, 1978 Duke L.J. 1198, 1214–15, 1222. Because the right of publicity does not differ in kind from copyright, the Players' rights of publicity in their performances cannot escape preemption.[28]

27. We note that, in an opinion that the Players cite as support for their assertion, California Supreme Court Chief Justice Bird acknowledged that federal copyright protection and recognition of the right of publicity serve similar purposes. *See Lugosi v. Universal Pictures*, 25 Cal.3d 813, 840, 603 P.2d 425, 441–42, 160 Cal. Rptr. 323, 339–40 (1979) (Bird, C.J., dissenting).

28. The Players also claim that the Clubs' copyright provides protection only against third-party infringers who transmit the televised broadcasts without authorization. We disagree. The "work for hire" doctrine grants the Clubs as employers exclusive rights in the telecasts of the games against the Players as employees.

29. The Players also are at liberty to attempt to negotiate a contractual limitation excluding performances before broadcast audiences from their scope of employment. *Cf. Brinkley v. Casablancas*, 80 A.D.2d 428, 438 N.Y.S.2d 1004 (1981) (model who consented to be photographed for certain posters and to filming of

In this litigation, the Players have attempted to obtain *ex post* what they did not negotiate *ex ante*. That is to say, they seek a judicial declaration that they possess a right—the right to control the telecasts of major league baseball games—that they could not procure in bargaining with the Clubs. The Players' aim is to share in the increasingly lucrative revenues derived from the sale of television rights for over-the-air broadcasts by local stations and national networks and for distribution by subscription and pay cable services. Contrary to the Players' contention, the effect of this decision is not to grant the Clubs perpetual rights to the Players' performances. The Players remain free to attain their objective by bargaining with the Clubs for a contractual declaration that the Players own a joint or an exclusive interest in the copyright of the telecasts.[29]

## C. Master-Servant Claim

The Clubs sought a judgment "declaring (a) that the plaintiffs, as employers who create the product, Major League Baseball games, own all rights in and to Major League Baseball games, including the right to telecast them, and (b) that the Major League Baseball players, by virtue of their employment, have no rights in and to the product." *Baltimore Orioles* Complaint, Prayer for Relief ¶ 2.[30] The district court

modeling session for broadcasts on cable television held to possess cause for action for violation of her right of publicity when additional unauthorized posters were made from photographs taken at the modeling session).

30. The Clubs' copyright and master-servant claims are distinct. With respect to the first claim, the Clubs contend that their copyright in the simultaneously recorded telecasts of major league baseball games preempts the Players' rights of publicity in their performances. This claim, however, is limited to games that are fixed in tangible form. With respect to the second claim, the Clubs assert that, as employers, they own the right to broadcast the Players' performances, regardless of whether the game is reduced to tangible form. This claim extends to games that are not broadcast or that are televised without being videotaped.

found that the Clubs, as employers, retain all rights in their employees' work product. *See Baltimore Orioles,* 1985 Copyright L.Dec. at 19,736. It thus granted summary judgment and entered final judgment for the Clubs on this claim. On appeal, the Players argue that the district court erred in holding that their status as employees extinguished their rights of publicity in their performances.

In particular, the Players assert that they possess rights of publicity in their names, likenesses, and performances, *see Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139, 148–49 (3d Cir.1981) (professional baseball player), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982); *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866, 868 (2d Cir.) (same), *cert. denied,* 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953); *Uhlaender v. Henricksen,* 316 F.Supp. 1277, 1282 (D.Minn.1970) (same); *see also Zacchini,* 433 U.S. at 573 n. 10, 576, 97 S.Ct. at 2856 n. 10, 2857, and that their rights of publicity prevent use of their persona without their express written consent. *See, e.g., Dzurenko v. Jordache, Inc.,* 59 N.Y.2d 788, 451 N.E.2d 477, 464 N.Y.S.2d 730 (1983); *see also* N.Y.Civ.Rights Law § 51 (affording cause of action for commercial use of name or picture without prior written consent). They further argue that an employee's right of publicity bars an employer from using the employee's name, picture, or performance without the employee's consent, notwithstanding the master-servant relationship. *See, e.g., Caesar v. Chemical Bank,* 66 N.Y.S.2d 698, 487 N.E.2d 275, 496 N.Y.S.2d 418 (1985), *aff'g* 106 A.D.2d 353, 483 N.Y.S.2d 16 (1984);

*Martin v. Senators, Inc.,* 220 Tenn. 465, 418 S.W.2d 660 (1967); *Johnson v. Boeing Airplane Co.,* 175 Kan. 275, 262 P.2d 808 (1953). The Clubs respond by contending that, as employers, they possess all ownership interests in the work product that they hire the Players, as employees, to create, *see, e.g., Muenzer v. W.F. & John Barnes Co.,* 9 Ill.App.2d 391, 133 N.E.2d 312 (1956), and that an employee's right of publicity does not prevent the employer from using the employee's performances when the performances are the very product that the employee was hired to create. *See, e.g., Nelson v. Radio Corp. of America,* 148 F.Supp. 1 (S.D.Fla.1957); *Autry v. Republic Productions, Inc.,* 104 F.Supp. 918 (S.D. Cal.1952), *modified on other grounds,* 213 F.2d 667 (9th Cir.), *cert. denied,* 348 U.S. 858, 75 S.Ct. 83, 99 L.Ed. 676 (1954); *Zahler v. Columbia Pictures Corp.,* 180 Cal. App.2d 582, 4 Cal.Rptr. 612 (1960).

The threshold issue that we must decide is what law governs the Clubs' master-servant claims.[31] The parties offer no assistance. Instead of considering the choice-of-law question, they rely upon "traditional principles of master-servant common law." Appellees' Brief 8; *see* Appellant's Brief 43.[32] Notwithstanding the parties' assumptions to the contrary, master-servant common law exists only with reference to the laws of particular states. As Justice Brandeis once stated, "[t]here is no federal general common law." *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). For a federal court to base its decision on "established principles of master-servant common law" that are independent of the law of any

---

**31.** With respect to the Clubs' copyright claim, we were not required to determine the state or states whose law governed the Players' rights of publicity in their performances because federal law preempts "any such right or equivalent right in any such work under the common law or statutes *of any state.*" 17 U.S.C. § 301(a) (emphasis added).

**32.** The parties to a lawsuit, within broad limits, can stipulate expressly or impliedly to the law governing their dispute. *See Cates v. Morgan Portable Building Corp.,* 780 F.2d 683, 687–88

(7th Cir.1985); *cf. Twohy v. First National Bank of Chicago,* 758 F.2d 1185, 1190–91 (7th Cir. 1985) (under Illinois law, choice-of-law stipulations are effective so long as they bear a reasonable relationship to the dispute and do not violate public policy or the court's subject-matter jurisdiction). The Clubs and the Players did not expressly stipulate to the law of any state. Moreover, because they relied on the statutory and common law of well over a dozen states, we cannot conclude that they tacitly stipulated to the law of any one state.

state would contravene *Erie* by creating a federal common law of master-servant relationships.

■ In general, a federal district court sitting in diversity, and this court on appeal, must follow the choice-of-law rules of the state in which the district court sits.[33] *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *see also National Association of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284 (7th Cir. 1985). Although diversity of citizenship is not present in this case, federal courts, reasoning by analogy from diversity cases, have applied *Klaxon* to determine what law governs pendent state claims. *See National Resources Trading, Inc. v. Trans Freight Lines*, 766 F.2d 65, 68 (2d Cir. 1985); *Bi-Rite Enterprises, Inc. v. Bruce Miner Co.*, 757 F.2d 440, 442 (1st Cir.1985); *McSurely v. McClellan*, 753 F.2d 88, 110 (D.C.Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 49 n. 11 (4th Cir.1983), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); *Rohm & Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 428–29 (3d Cir.1982). We agree that the choice-of-law rule for pendent state claims should be that of the forum.

Illinois conflicts law thus governs the choice of law in this case. The Clubs' argument that their rights as employers supercede the Players' rights of publicity might be characterized as either a tort or contract claim. In tort cases, Illinois generally follows the "most significant relationship" approach, under which a court must weigh four factors: the place of the injury, the place of misconduct, the domicile of the parties, and the place where the

relationship between the parties is centered. *See International Administrators, Inc. v. Life Insurance Co. of North America*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985); *Dr. Franklin Perkins School v. Freeman*, 741 F.2d 1503, 1520 & n. 23 (7th Cir.1984); *In re Air Crash Disaster Near Chicago, Illinois, on May 25, 1979*, 644 F.2d 594, 611–12 (7th Cir.), *cert. denied*, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981). In contract cases, Illinois also generally applies the "most significant relationship" approach, under which the court is to consider five factors: the place of contracting, the place of negotiations, the place of performance, the situs of the subject matter of the contract, and the domicile of the parties. *See Dr. Franklin Perkins School*, 741 F.2d at 1515 n. 19.

It would be understating matters to say that the conflicts question in this case is complex. The 26 Clubs are located in 14 states and in Canada. The Major League Baseball Players Association is an unincorporated association of individuals from most, if not all, the states and many foreign countries. The Players' contracts were negotiated and executed in various states and call for performance at stadiums across the country. The Players' rights of publicity might be violated wherever their performances are broadcast without their consent.

Because we cannot ascertain on the basis of the record before us the state or states whose law governs the Clubs' master-servant claim, we will vacate the district court's opinion and judgment with respect to Count II of the *Baltimore Orioles* complaint and remand this matter for further proceedings. On remand, the district court should determine the appropriate choice-of-law rule under Illinois conflicts law and should make the factual findings necessary

---

**33.** When the parties fail to consider the choice of law in a diversity case, the substantive law of the forum is presumed to control. *See National Association of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284–85 (7th Cir.1985). The Players expressly relied

upon N.Y.Civ.Rights Law §§ 50–51 to support their contention that their rights of publicity are not extinguished by their status as employees. We thus conclude that it would be inappropriate to invoke such a presumption in this case.

to identify the state or states whose law controls.

█ The district court also should be mindful that the Clubs' master-servant claim is pendent to their copyright claim. "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *see, e.g., Rodgers v. Lincoln Towing Service*, 771 F.2d 194, 202 (7th Cir.1985). Whether pendent jurisdiction should be assumed is an issue that "remains open throughout the litigation." *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. In particular, when the federal claims are disposed of before trial, the state claims should be dismissed without prejudice almost as a matter of course. *See id.; see also, e.g., Graf v. Elgin, Joliet & Eastern Railway Co.*, 790 F.2d 1341, 1344 (7th Cir.1986); *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 611–12 (7th Cir.1986); *United States v. Zima*, 766 F.2d 1153, 1158 (7th Cir.1985). Although the federal claims have fallen out of this case so that only state claims remain, rather than deciding ourselves whether to retain pendent jurisdiction, we direct the district court to exercise its discretion in the first instance in light of the above principles. *See Buethe v. Britt Airlines, Inc.*, 749 F.2d 1235, 1242 (7th Cir.1984) (remanding for exercise of discretion with respect to retention of pendent jurisdiction); *see also Zima*, 766 F.2d at 1159 (citing cases).

## III

For the reasons stated above, the district court's judgment is AFFIRMED with respect to the Clubs' copyright claim and is VACATED with respect to the Clubs' master-servant claim and REMANDED for further proceedings consistent with this opinion and law.

---

* The original opinion in this case was issued and affirmed the order of the district court on November 15, 1985, with Circuit Judge John L. Coffey dissenting. The Secretary of Labor petitioned for a rehearing en banc and the original opinion of the panel was vacated and this opinion substituted by the court sitting en banc.